ORIGINAL

FILED
APR 16 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

| | |
|---|---|
| CIRCLE LINE – STATUE OF LIBERTY FERRY, INC., Plaintiff, | Case No. 07-237 C |
| v. | Judge ____________ |
| THE UNITED STATES OF AMERICA, Defendant. | |

**VERIFIED COMPLAINT**
**FOR INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiff CIRCLE LINE–STATUE OF LIBERTY FERRY, INC. ("Circle Line") brings this bid protest action against the UNITED STATES OF AMERICA, acting through the Department of the Interior's National Park Service ("Park Service"). The protest objects to the Park Service's prospectus soliciting a concessions contract for ferry service to the Statue of Liberty National Monument and Ellis Island, Solicitation No. STLI0001-07. In support of its causes of action, Circle Line avers as follows:

## NATURE OF ACTION

1. This bid protest challenges a prospectus issued by the Department of the Interior's National Park Service soliciting a new ten-year concessions contract for ferry service to the Statue of Liberty National Monument and Ellis Island.

2. Circle Line is an "interested party" within the meaning of 28 U.S.C. § 1491(b), and a prospective bidder for the new concessions contract. As the incumbent contractor for more than 50 years, Circle Line has a substantial chance of receiving the award of the new contract and faces substantial, irreparable prejudice unless relief is granted by the Court under 28 U.S.C. § 1491(b)(2).

3. Circle Line is "objecting to a solicitation" within the meaning of 28 U.S.C. § 1491(b). In particular, Circle Line seeks injunctive and declaratory relief to prevent the Park Service from proceeding with its unlawful prospectus. Unless enjoined by this Court, responses to the prospectus will be due no later than 4:00 p.m. on April 27, 2007.

4. Injunctive and declaratory relief is necessary and warranted because the Park Service's prospectus:

a. arbitrarily, capriciously, unlawfully, and without rational basis denies Circle Line its pre-existing implied right of preference in contract renewal, which it negotiated with the Park Service when executing its current 1989 contract, and which Congress protected under the National Park Service Concessions Management Improvement Act of 1998;

b. arbitrarily, capriciously, unlawfully, and without rational basis fails to disclose the procedures it used in, and the information it relied on in, estimating the value of

those Circle Line's assets required to be transferred to a successor concessioner in the event that Circle Line is not awarded the next contract;

c. arbitrarily, capriciously, unlawfully, and without rational basis fails to disclose the process by which Circle Line's assets will be transferred to a successor in the event Circle Line is not awarded the next contract, and fails to ensure that Circle Line will receive full and proper payment before any such transfer occurs;

d. arbitrarily, capriciously, unlawfully, and without rational basis deprives the next concessioner of its statutory right to set reasonable and appropriate rates, and drains the concession as a whole of the revenue it needs to maintain current levels of service to the public by freezing passenger fares for three years at below-market rates that may not be adjusted to account for increases in inflation.

## JURISDICTION

5. Jurisdiction in this Court is proper under the Administrative Dispute Resolution Act ("ADRA") and the Tucker Act. *See* 28 U.S.C. § 1491(b)(1).

6. This Court may declare the rights and other legal relations of the parties pursuant to 28 U.S.C. § 1491(b) because there is an actual controversy within the Court's jurisdiction to provide a declaratory judgment concerning (i) the legal deficiencies of the Park Service's solicitation process for a concessions contract to provide ferry service to the Statue of Liberty National Monument and Ellis Island, and (ii) the interpretation of the requirements of the existing concessions contract held by Circle Line.

## PARTIES

7. Plaintiff Circle Line-Statue of Liberty Ferry, Inc. is a New York corporation with its principal place of business in New York, New York. It is the incumbent contractor for ferry

concession services at the Statue of Liberty National Monument and Ellis Island, pursuant to Contract No. CC-STLI0001-89, dated August 15, 1989 and effective April 1, 1989 (the "1989 contract"). (A copy of Circle Line's 1989 contract is included in the appendix to this complaint as Exhibit 12.)

8. The United States, through the National Park Service, issued Solicitation Number STLI0001-07, a ten-year concessions contract for providing ferry services to the Statue of Liberty National Monument and Ellis Island. *See Prospectus: A Concession Opportunity for Ferry Service at Statue of Liberty National Monument and Ellis Island*, Solicitation No. STLI001-07 (Dec. 28, 2006). (A complete copy of the prospectus is available at www.concessions.nps.gov/Prospectus.cfm.)

## GENERAL ALLEGATIONS

### The History Of Concessions In The National Park System

9. When Congress created the National Park Service in 1916, it charged the agency with developing the national parks for the public's enjoyment. See 16 U.S.C. § 1. Throughout its history, the Park Service has relied on private concession contractors, such as Circle Line, to fulfill its statutory mission, luring businesses "into the parks by offering them contractual incentives" to make the substantial investments needed to build, maintain, and operate visitor facilities. NPS, Concessions Reform (A copy of this document is included in the appendix to this complaint as Exhibit 55).

10. The most important of these incentives was arguably the Park Service's oft-repeated promise that concessioners were entitled to a right of preference in the renewal of their contracts subject only to the condition that they continue to perform their concession duties satisfactorily.

11. Concessioners who were granted a right of preference executed their contracts with the understanding that, unless they failed to perform satisfactorily, they were entitled to renew their contracts at expiration by matching the best offer of any potential competitor.

12. The Park Service recognized that concessioners who were guaranteed rights of preference in renewal — and thus an increased likelihood that they would continue to earn a return on their investment through future contracts — were willing to make substantial investments in the national parks that otherwise would not have been possible.

13. By granting concessioners rights of preference in renewal, the Park Service encouraged concessioners to continue to improve visitor services, especially as contracts neared their expiration date. The Park Service also benefited from continuity in park operations and consistency in visitor services. *See Park Concession Policy: Hearing on H.R. 5872, 5886, 5873, 5887 & 5796 Before the Subcomm. on Nat'l Parks of the House Comm. on Interior & Insular Affairs*, 88th Cong. 116, at 90 (1964) ("1964 Hearings") (Statement of Director George B. Hartzog, Jr.). (A copy of the 1964 Hearings is included in the appendix to this complaint as Exhibit 54.)

14. Statements issued by the Park Service in the 1930s through the 1950s made clear the Park Service's policy that a "preferential opportunity will be granted to existing concessioners to negotiate a new contract in the event they have rendered satisfactory service during the life of their expiring contracts." 1964 Hearings, at 23-24; *see also* Memorandum for the Acting Under Secretary, U.S. Department of Interior (Aug. 10, 1940) (A copy of this Memorandum is included in the appendix to this complaint as Exhibit 53.)

15. The Park Service's policies did not require preferential rights in renewal to appear expressly within the four corners of contract documents. Upon information and belief, although

the Park Service consistently recognized that incumbent concessioners were entitled to exercise preferential rights in renewal, not a single contract during the period of the 1930s through the 1950s included the contractual right of preference as an express contract term.

**The Concessions Policy Act of 1965**

16. Against this regulatory backdrop, Congress passed the Concessions Policy Act of 1965, Pub. L. No.89-249, 79 Stat. 969 (1965) ("1965 Act"), codifying the Park Service's long-standing policy of granting contractual rights of renewal as an inducement for concessioners to invest substantial amounts of capital in the national parks. *See* Ltr. Secretary S. Udall to Rep. Aspinall (May 14, 1965), *reprinted* in S. Rep. No. 89-765, 1965 U.S.C.C.A.N. 3489, 3495. (A copy of Secretary Udall's letter to Representative Apsinall is included in the appendix to this complaint as Exhibit 55.)

17. The purpose of the Act was "to put into statutory form policies which, with certain exceptions" had been "followed by the National Park Service in administering concessions within units of the national park system and in writing contracts for concessionaire services there." S. Rep. No. 89-765, 1965 U.S.C.C.A.N. at 3489-3490. (A copy of this document is included in the appendix to this complaint as Exhibit 54.)

18. The policies that applied to Park Service contracts included "the granting of preferential rights to established concessioners ... in the renewal and extension of contracts." *Id.* at 3490.

19. Section 5 of the 1965 Act states: "The Secretary shall encourage continuity of operation and facilities and services by giving preference in the renewal of contracts ...." 16 U.S.C. § 20d.

20. The Park Service recognized that the right of preference embodied in section 5 of the 1965 Act was a powerful bargaining tool and that, without the right of preference, investment

in the Nation's parks would substantially decrease. Accordingly, the Park Service took steps to reassure concessioners that, even if the *statutory* right were to be eliminated by a subsequent Congress, the right would be protected as a matter of contract.

21. To assure concessioners that the right of preference was included as an implied term in certain concession contracts, the Park Service assembled the "prospectus" or "Fact Sheet" for contracts by attaching and incorporating by reference the 1965 Act, and sometimes even specifically mentioning the right of preference when describing the "term of contract" on which a potential concessioner might bid.

22. Moreover, the Park Service's contracting officials would often reassure individual concessioners that the right of preference was included as an implied term in particular concession contracts executed under the 1965 Act.

23. For example, David Gackenbach, the Park Service's Chief of Concessions in the 1980s, told several groups of concessioners that their contracts included implied contractual preferential rights, and emphasized that they "could only be deprived" of the right of preference in renewal "if they failed to perform satisfactorily under their contracts." Declaration of D. Gackenbach ¶¶ 2-5 (Feb. 26, 2001). (A copy of Mr. Gackenbach's declaration is included in the appendix to this complaint as Exhibit 28.)

24. Similarly, between 1976 and the mid-1990s, Phil Parker, then the Park Service's Chief of Concessions for the Pacific Northwest Region, "told concessioners whenever asked, that the contracts negotiated and approved by [him] included a right of preference in renewal, even though that right was not expressly stated in their contract." He continued to make these statements, even when Congress discussed eliminating the statutory right, emphasizing to concessioners that "any proposed changes" in the statute "would not deprive" them "of their

existing contractual rights, including the implied right of preference in renewal." Declaration of P. Parker ¶ 7-10 (Feb. 27, 2001). (A copy of Mr. Parker's declaration is included in the appendix to this complaint as Exhibit 29.)

25. Likewise, in 1982, Ronald Everhart, the Park Service's Regional Chief of Concessions, explained to a concessioner that there was no need to make the right of preference an express term because the right was implied in the contract and could be lost only if the concessioner failed to perform satisfactorily. *See* Declaration of S. Tedder ¶¶ 5-6 (Feb. 27, 2001); *see also* Declaration of P. Prevost ¶¶ 6-7 (Apr. 27, 2001) (recounting statement by former Park Service Director, Gary Everhardt, that the right of preference was "implicitly incorporated into" the concessioner's contract). (A copy of Mr. Tedder's and Ms. Prevost's declarations are included in the appendix to this complaint as Exhibits 32 and 31.)

26. By providing these assurances, the Park Service induced concessioners, like Circle Line, to sign contracts requiring them to invest more money in their concession operations than otherwise would have been economically prudent, and concessioners routinely performed beyond the letter of their contracts to ensure that their performance remained "satisfactory." *See, e.g.*, Declaration of D. Schaefer ¶¶ 4-5 (Feb. 26, 2001); Declaration of J. Fassler ¶ 11 (Feb. 26, 2001); Declaration of D. Woodside ¶¶7-9 (Feb. 26, 2001). (A copy of Messrs. Schaefer's, Fassler's, and Woodside's declarations are included in the appendix to this complaint as Exhibits 30, 33, and 34.)

**The Concessions Management Improvement Act Of 1998**

27. On November 13, 1998, the President signed into law the Concessions Management Improvement Act of 1998 ("1998 Act"), included as sections 401-419 of the National Parks Omnibus Management Act of 1998, Pub. L. No. 105-391, 112 Stat. 3497 (Nov. 13, 1998).

28. The 1998 Act seeks to further the mission of the National Park system by protecting the parks for the future while at the same time ensuring that the parks have appropriate accommodations, facilities, and services. *See* 16 U.S.C. § 5951. The 1998 Act governs the entire concessions contract process, from delineating the factors that confine the Park Service's choice of concessioner at the outset of a contract to ensuring that concessioners' rights are protected when a contract expires.

29. Although the 1998 Act generally repeals the provisions of the 1965 Act, Congress included a savings provisions, which provides that the 1998 Act does not "affect the validity of any concessions contract" entered into under the 1965 Act, and that the 1998 Act does not apply to existing contracts "to the extent [it is] inconsistent with" those contracts. 16 U.S.C. § 20 note.

30. In enacting the 1998 Act, Congress took care to protect the implied contractual rights, as well as the express contractual rights of National Park Service concessioners. Although an early draft of the 1998 Act would have limited the Act's preservation of existing contractual rights to *express* rights appearing in existing concession contracts, the version of the legislation actually enacted deleted that limitation. As written on the statute books, it is clear beyond doubt that the 1998 Act protects all implied terms included in pre-1998 Act contracts like Circle Line's.

**Circle Line's Concessions Contract Under The 1965 Act**

31. For the last half-century, Circle Line has operated ferry concession services at the Statue of Liberty under successive contracts with the National Park Service. Under the terms of these contracts, Circle Line has been required to make substantial, multi-million dollar investments in the concession operations, including building vessels to exacting specifications mandated by the Park Service.

32. Circle Line's current contract became effective on April 1, 1989 and was initially due to expire on March 31, 2004.

33. Working closely with the Park Service, Circle Line's concession operations expanded under its 1989 contract. In 1989, Circle Line transported fewer than 2.7 million passengers to Liberty and Ellis Islands. From 1996 to 2001, however, it transported, on average, in excess of 4 million passengers each year, with visitation reaching a peak of 4.3 million in 2000.

34. The attacks of September 11, 2001, dramatically changed things. The Park Service closed Liberty and Ellis Islands, pending a comprehensive security review that suspended concession operations for over three months. And even after the Islands reopened and New York tourism grew to exceed pre-2001 levels, the Park Service's temporary security arrangements continued to deter visitation to those sites.

35. Circle Line responded to the attacks of September 11 by putting aside its own financial and contract concerns, even though its concession operations were crippled, and rallying to the Park Service's side. Among other things, Circle Line helped diffuse criticism of the Park Service by starting a new harbor tour service to accommodate visitors who wanted close-up views of the closed-down Statue of Liberty; it helped identify potential long-term embarkation facilities for the concession operations; it provided the Park Service with extensive reports on security and emergency evacuation procedures; and, when the Statue of Liberty eventually reopened, it helped develop a state-of-the-art reservation system. *See*, *e.g.*, Security Access Report (Jan. 14, 2002) (A copy of Circle Line's Security-Access Report is included in the appendix to this complaint as Exhibit 24.); Evacuation Report (Feb. 13, 2002) (A copy of Circle Line's Evacuation Report is included in the appendix to this complaint as Exhibit 23.); Ltr. K

Moran to C. Garrett (July 8, 2004) (A copy of Mr. Moran's letter to Ms. Garrett is included in the appendix to this complaint as Exhibit 48.); Pier A Report (Feb. 22, 2005) (A copy of Circle Line's Pier A Report is included in the appendix to this complaint as Exhibit 22.).

36. Eventually, Park Service consultants determined that Circle Line suffered millions of dollars in economic losses resulting from the Park Service's access restrictions. Circle Line nonetheless continued to make substantial investments in the concession operations in reliance on the Park Service's assurances that its contract included an implied right of preference in renewal.

37. With Circle Line's continued assistance, the Park Service gradually improved visitor security procedures and increased access to Liberty and Ellis Islands.

38. In November 2003, the Park Service determined that it would not "be able to issue a new long-term concession contract … prior to the current contract's expiration on March 31, 2004." To have more time to "evaluate all aspects of providing visitor services for Liberty Island and Ellis Island," the Park Service proposed, and Circle Line agreed, to extend the contract for three years to March 31, 2007. Except for changing the contract's expiration date, the parties agreed that "[a]ll other terms and conditions of the contract" would "remain the same." *See* Ltr. M. Rust to K. Moran (Nov. 5, 2003). (A copy of Ms. Rust's letter to Mr. Moran is included in the appendix to this complaint as Exhibit 49.)

39. On March 9, 2007, the Park Service extended Circle Line's contract a second time. Under the terms of the extension, Circle Line's contract is scheduled to expire on October 1, 2007 or "until such time as a new contract" is awarded, "whichever occurs first." Once more, apart from the new expiration date, the parties agreed that "[a]ll other terms and conditions of the

contract" would "remain the same." Ltr C. Garrett to K. Moran (Mar. 9, 2007). (A copy of Ms. Garrett's letter to Mr. Moran is included in this appendix to this complaint as Exhibit 18.)

**The Park Service's Prospectus**

40. On December 28, 2006, the National Park Service issued its prospectus soliciting a new ten-year concessions contract to provide passenger ferry service to the Statue of Liberty National Monument and Ellis Island.

41. The Park Service's prospectus requires bidders to accept "all the terms and conditions of the concession opportunity," as set forth in the prospectus, and states that any prospective offeror that fails to "accept without condition" the terms of the prospectus "may be considered non-responsive." Prospectus, Proposal Package, at 1. (A copy of the Prospectus Proposal Package is included in the appendix to this complaint as Exhibit 3.)

42. The prospectus states that the selected concessioner, whether it is Circle Line or a successor, will be expected to begin operations under the new contract by September 17, 2007.

43. Beginning long before and continuing after the prospectus's release, Circle Line made numerous submissions to the Park Service's administrative record. These submissions covered a variety of topics but generally focused on three issues: (1) whether the Park Service would honor the implied right of preference in renewal negotiated and guaranteed under Circle Line's 1989 contract; (2) whether the prospectus would accurately describe the basis for ascertaining the value of Circle Line's assets and the process for transferring those assets to a successor concessioner in the event Circle Line is not awarded the next contract; and (3) whether the Park Service would comply with the statutory requirements permitting concessioners to make reasonable and appropriate adjustments in passenger fares.

44. In addition, the prospectus required all interested parties to submit questions by January 16, 2007. On information and belief, nine parties, including Circle Line, submitted

questions to the Park Service. (A copy of Circle Line's questions are included in the appendix to this complaint as Exhibit 6.)

45. Circle Line's questions focused largely on operational issues that were ambiguous or had not been adequately explained in the Park Service's prospectus. Certain questions renewed Circle Line's request that the Park Service address the issues raised in its earlier submissions and provide a reasoned explanation for its decision. Still other questions sought clarification of proposed contract requirements that appeared to be misleading.

46. For example, although concessioners are entitled to earn a reasonable profit, the prospectus estimates that, in addition to the substantial 18% franchise fee payable to the Park Service, expenses could equal 81% of gross revenues, leaving the concessioner only 1% in net profit. Similarly, although the revenue generated from Circle Line's current harbor cruise service has never exceeded 4% of the revenue generated from the ferry service to the Statue of Liberty, the Park Service estimated without explanation that the harbor cruise service to be conducted under the prospectus would provide 10% of the projected concession revenue.

47. On January 30, 2007, the Park Service's Chief of Concessions, Northeast Region released the Park Service's first response to questions, responding only to the questions submitted by Patrick McGeehan, a reporter for the New York Times. (A copy of the Park Service's first response to questions is included in the appendix to this complaint as Exhibit 7.)

48. On January 31, 2007, the Park Service extended the due date for proposals by 60 days from February 27, 2007 to April 27, 2007.

49. On or about March 2, 2007, the Park Service's regional office released the Park Service's second set of responses to questions. (A copy of the Park Service's second response to questions is included in the appendix to this complaint as Exhibit 8.) Two weeks later, on or

about March 16, 2007, the regional office released the Park Service's third set of responses to questions. (A copy of the Park Service's third response to questions is included in the appendix to this complaint as Exhibit 9.) On or about March 30, 2007, the regional office released the Park Service's fourth and final set of responses to questions. (A copy of the Park Service's fourth response to questions is included in the appendix to this complaint as Exhibit 10.)

50. Apart from these terse and incomplete formal responses to questions, the Park Service has not responded to Circle Line's submissions or provided any further support for its determinations.

51. In preparing the solicitation for the next long-term concessions contract, the Park Service has found itself subjected to scrutiny and pressure from local and national politicians, business development groups, competing ferry service operators, not-for-profit organizations, and other groups.

52. For example, the City of New York recently unveiled a proposal to appoint itself a permanent third partner in the longstanding relationship between the National Park Service, a federal agency, and the private boat company that conducts Statue of Liberty ferry operations. The City proposed a Memorandum of Understanding with potential bidders for the concession that would have provided that the City's Economic Development Corporation, not the successful bidder, would become the primary point of contact between the Park Service and the ferry service provider.

53. The Park Service responded on April 5, 2007, by publishing an unscheduled announcement stating that the City's Memorandum of Understanding "may not be in accordance with" Park Service "policy, laws, and regulations." (A copy of the Park Service's April 5 notice is included in the appendix to this complaint as Exhibit 11.)

# SPECIFIC ALLEGATIONS

**Specific Allegations Relevant To The Right of Preference In Renewal**

54. Circle Line's current contract includes an implied right of preference in renewal, which the parties specifically negotiated and agreed upon before executing the 1989 contract.

55. On September 8, 1982, Circle Line and the Park Service entered into a ten-year contract under which Circle Line agreed to provide ferry services to the Statue of Liberty and Ellis Island covering the period from April 1, 1982 through March 31, 1992.

56. The 1982 contract guaranteed Circle Line a reasonable opportunity to earn a profit, and required Circle Line to make substantial investments, including purchasing a new vessel and improving designated food and souvenir sales facilities and services. Unbeknownst to Circle Line, the Park Service had already decided when it solicited the 1982 contract that it would shut down concession operations to complete massive renovations to the Statue of Liberty.

57. On May 29, 1984, the Park Service closed the Statue of Liberty's crown and its external viewing areas, and in 1985 closed Ellis Island to make renovations to the Great Hall. Then, from June 24, 1985 through July 5, 1986, the Park Service closed Liberty Island and required Circle Line to discontinue altogether its concession operations under its contract.

58. Circle Line suffered millions of dollars in economic losses as a result of the Park Service's forced closure of concession operations. The Park Service acknowledged that it was responsible for Circle Line's losses, but recognized that when the park reopened it would need Circle Line to build new vessels to satisfy increased visitor demand.

59. Although the Park Service initially agreed that it would compensate Circle Line by waiving franchise fee payments and extending Circle Line's contract, the Park Service

ultimately changed course and told Circle Line that it intended to solicit a new contract with a fifteen-year term.

60. On June 22, 1988, the Park Service published in the Federal Register a notice of intent to negotiate a new concessions contract. The Park Service's formal Statement of Requirements, which the Park Service told Circle Line included all "the requirements and conditions" under which the Park Service "propose[d] to continue the operation," stated that, under the new contract, the new concessioner would enjoy a right of preference in renewal.

61. The Statement of Requirements noted that if Circle Line were awarded the new contract, it would be required to give up three years on its existing contract. The Statement of Requirements also made clear that Circle Line, or any company that prevailed in the bidding process, would be required to purchase two new vessels and make other improvements to the concession operations.

62. Given the terms of the solicitation, it was important to Circle Line that the new contract include the right of preference in renewal. Without a guaranteed right of preference, Circle Line would not have been willing (or economically able) to accommodate the Park Service's request that it forgo three years of its existing contract, forgo compensation for losses suffered during the term of that contract, expand its operations, and make the substantial investments needed to build two new vessels. Circle Line also would not have been willing to accept the Park Service's repudiation of its earlier commitment to extend Circle Line's contract and reduce franchise fee payments.

63. Circle Line and its counsel made a point of confirming with the Park Service that Circle Line would be entitled to exercise its right of preference at the end of the contract. Circle Line's counsel, George B. Hartzog, Jr., contacted Park Service officials in Washington, D.C.,

and asked them to include the right of preference as an express term in the concessions contract. *See generally* Affidavit of J. Moran (July 20, 2006). (A copy Mr. Moran's affidavit is included in the appendix to this complaint as Exhibit 27.)

64. The Park Service told Mr. Hartzog that it was not necessary to include the right of preference as an express contractual term. In the Park Service's view, because both sides understood that Circle Line would be entitled to the right of preference in renewal, there was no basis for modifying the language of the Park Service's standard form contract to expressly mention the existence of the right of preference. *See id.* at ¶¶ 34-38.

65. The Park Service also told Circle Line that, although both sides mutually agreed that Circle Line would enjoy a right of preference in renewal under its 1989 contract, including the right as an express, as opposed to an implied, term would have required the Park Service to reopen contentious debates over the standard form contract, which would have inconvenienced the Park Service. *See id.* at ¶ 36.

66. Circle Line accepted and relied on these assurances that the right of preference would be protected under, and impliedly included in, the successor to its 1982 concessions contract. Based on these assurances, Circle Line executed the 1989 contract and continued to make substantial investments in the concession operations. *See id.* at 36-38.

67. The prospectus did not recognize or respond in any way to the evidence and other extensive materials establishing Circle Line's entitlement to a right of preference, which Circle Line had previously submitted to the Park Service.

68. On August 31, 2006, in anticipation of the issuance of the prospectus now being challenged, Circle Line submitted a report to the Park Service substantiating that an implied right of preference in renewal is included in Circle Line's current contract. *See* Ltr. R. Gasaway to J.

Pendry (Aug. 31, 2006). (A copy of Circle Line's right-of-preference report is included in the appendix to this complaint as Exhibit 21.)

69. The reported included over 400 pages of documents, including numerous declarations from concessioners and former Park Service officials.

70. Perhaps most significantly, Circle Line attached to its report a detailed affidavit from Circle Line's Joseph A. Moran. Mr. Moran had directly participated in the negotiations with the Park Service over the terms of the 1989 contract. Mr. Moran testifies in his affidavit that, in consideration for Circle Line's agreement to build two new vessels, to forgo three years of operations under its previous 1982 contract, and not to pursue litigation for damages arising out of the Park Service's forced suspension of the concession operations, the Park Service agreed and assured Circle Line that the contract included an implied right of preference. (A copy Mr. Moran's affidavit is included in the appendix to this complaint as Exhibit 27.)

71. Circle Line followed this initial report with a second, supplemental submission on September 11, 2006. *See* Ltr. R. Gasaway to J. Pendry (Sept. 11, 2006). (A copy of Circle Line's supplemental submission is included in the appendix to this complaint as Exhibit 42.)

72. The supplemental submission included an affidavit from George B. Hartzog, a highly regarded former Director of the National Park Service, who served as Circle Line's attorney in the discussions and negotiations leading up to the execution of Circle Line's 1989 contract. (A copy of Mr. Hartzog's affidavit is included in the appendix to this complaint as Exhibit 26.)

73. The supplemental submission also included a declaration from Herbert S. Cables, the National Park Service's Regional Director from 1982 to 1989, who was responsible for

negotiating Circle Line's contract on behalf of the Park Service. (A copy of Mr. Cables declaration is included in the appendix to this complaint as Exhibit 25.)

74. Mr. Hartzog and Mr. Cables both state that it was the mutual understanding of Circle Line and the Park Service that Circle Line's contract included an implied right of preference in renewal, and that both parties regarded it as a valuable part of the consideration provided under the contract.

75. As Mr. Cables explained, "in negotiating the 1989 contract with Circle Line, "the Park Service agreed that the right of preference in renewal would be part of the consideration that Circle Line would receive in return for its agreement to give up three years on its existing 1982 contract as part of the resolution of issues relating to the closure of the Statue of Liberty in the mid-1980s." Cables Decl. ¶ 5.

76. Notwithstanding its extensive submissions, the Park Service's December 28, 2006 prospectus states its determination that Circle Line is not considered a preferred offeror and thus refuses to recognize Circle Line's right of preference in renewal.

77. On January 2, 2007, Circle Line forwarded its right of preference report to the Solicitor for the Department of the Interior, David L. Bernhardt. *See* Ltr. R. Gasaway to D. Bernhardt (Jan. 2, 2007) (A copy of Mr. Gasaway's letter to Solicitor Bernhardt is included in the appendix to this complaint as Exhibit 40.)

78. On January 25, 2007, Circle Line sent its right of preference report directly to the Park Service's Director, Mary Bomar. *See* Ltr. R. Gasaway to M. Bomar (Jan. 25, 2007) (Ex. 37); *see also* Ltr. R. Gasaway to P. McLay (Jan. 25, 2007) (A copy of Mr. Gasaway's letter to Director Bomar is included in the appendix to this complaint as Exhibit 38). Circle Line never received a response from the Director regarding its right of preference.

79. On January 25, 2007, Circle Line also sent its right of preference report to Pam McLay, the Park Service official responsible for preparing the Park Service's prospectus. *See* Ltr. R. Gasaway to P. McLay (Jan. 25, 2007). (A copy of Mr. Gasaway's letter to Ms. McLay is included in the appendix to this complaint as Exhibit 38.)

80. In addition, in questions submitted to the Park Service on January 16, 2007, Circle Line referenced the extensive materials, which it had previously submitted, showing that the right of preference in renewal had been incorporated as an unwritten term of its current contract.

81. In its questions, Circle Line asked whether the Park Service intended to disclose that information to prospective bidders and, if it did not intend to disclose the information, to explain why. Circle Line also asked the Park Service to provide the basis for its determination that "no Preferred Offeror for this Draft Contract exists."

82. In its response to these questions, and the more than 400 pages of analysis and supporting materials provided by Circle Line, the Park Service stated:

> NPS regulations at 36 C.F.R. § 51.102 (see Prospectus Appendix D), discuss the issue of preference in the renewal of concession contracts, noting that the Concessions Policy Act of 1965 (the 1965 Act) provided such a statutory right, and that the National Park Service Concessions Management Improvement Act of 1998 (the 1998 Act, see Prospectus Appendix M) repealed this statutory provision. In accordance with the 1998 Act, NPS regulations provide that "It is the final decision of the Director ... that holders of 1965 Act concession contracts are not entitled to be given a renewal preference with respect to such contracts ..." unless the 1965 Act concession contract makes express reference to such a preference. 36 C.F.R. § 51.102(a). This regulation was upheld by the District Court for the District of Columbia and the Court of Appeals for the District of Columbia. See, *Amfac Resorts, L.L.C., et al. v. Dep't of Interior*, 142 F.Supp.2d 54 (D.D.C. 2001), and *Amfac Resorts, L.L.C., et al. v. Dep't of Interior*, 282 F.3d 818 (D.C. Cir. 2002). Because the Existing Concession Contract does not contain an express provision regarding a preference in the renewal of the Contract, the Director has determined that no

> Preferred Offeror for the new concession contract exists in accordance with 36 C.F.R. § 51.102.

83. The Park Service's response misinterpreted the D.C. Circuit's *Amfac* decision and did not address the portions of decision providing that concessioners are entitled on a case-by-case basis to prove that a meeting of the minds was reached with Park Service officials, as "inferred from the 'conduct of the parties showing, in light of the surrounding circumstances," that a right of preference would be included as an unwritten contractual term. *Amfac Resorts, LLC v. U.S. Department of Interior*, 282 F.3d 818, 828 (D.C. Cir. 2002).

84. The Park Service did not provide any other response to Circle Line's extensive submissions.

**Specific Allegations Relevant To The Transfer Of Circle Line's Assets**

85. Circle Line's current contract requires that its seven vessels, along with the other assets "used or held for use" in connection with the concession operations, must be purchased by the successor concessioner in the event the next contract is not awarded to Circle Line.

86. A boat builder, Blount Boats, Inc., has estimated that in today's market it would cost between $41.75 million and $46.5 million to replace Circle Line's seven-vessel fleet. *See* Ltr. B. Pelletier to J.B. Meyer (Dec. 20, 2006). (A copy of the letter from Mr. Pelletier to Mr. Meyer is included in the appendix to this complaint as Exhibit 41.)

87. Circle Line was concerned that in its prospectus the Park Service would fail to disclose the value Circle Line's assets to prospective bidders.

88. Starting in the Spring of 2006, Circle Line proposed to Park Service officials that the parties "collaborate to remove to the greatest extent possible any source of unnecessary delay, expense, or litigation of the type that has characterized other recent NPS concession contract awards involving valuable properties." Ltr. R. Gasaway to A Conte (May 11, 2006). (A

copy of Mr. Gasaway's May 11 letter to Mr. Conte is included in the appendix to this complaint as Exhibit 47.)

89. To avoid unnecessary disputes over the value of Circle Line's assets, Circle Line suggested that the Park Service "agree to amend the contract so as to provide for a full and fair appraisal of Circle Line's property … *before* the Park Service releases the solicitation." Circle Line hoped that, through such a process, the parties could arrive "at a fixed figure that could be solidly relied upon by any and all bidders for the next concessions contract," and avoid the problems in other recent solicitations where Park Service-appointed appraisers had significantly undervalued the incumbent concessioner's assets. *Id.*; *see also* Ltr. R. Gasaway to A. Conte (May 26, 2006). (A copy of Mr. Gasaway's May 26 letter to Mr. Conte is included in the appendix to this complaint as Exhibit 46.)

90. When the Park Service rejected this proposal, Circle Line suggested an alternative approach, offering to have its experts meet with the Park Service's appraisers to discuss the "assumptions and methodologies" for valuing Circle Line's assets. *See* Email R. Gasaway to A Conte (Aug. 7, 2006). (A copy of Mr. Gasaway's August 7 email to Mr. Conte is included in the appendix to this complaint as Exhibit 45.)

91. This second proposal was likewise rejected. Although the Park Service would not release its prospectus for more than four months after Circle Line's proposal, the Park Service took the position that given the "expedited schedule for preparation of the prospectus there would not be time for a meeting." Email A. Conte to R. Gasaway (Aug. 9, 2006). (A copy of Mr. Conte's August 9 email to Mr. Gasaway is included in the appendix to this complaint as Exhibit 44.)

92. After the Park Service released its prospectus on December 28, 2006, Circle Line provided a packet of materials to the Solicitor for the Department of the Interior, David L. Bernhardt, and requested "an opportunity to meet" at his earliest convenience. With this letter, Circle Line enclosed (among other things) a detailed analysis addressing issues relating to the transfer of assets under Circle Line's contract. *See* Ltr. R. Gasaway to S. Bernhardt (Jan. 2, 2007). (A copy of Mr. Gasaway's January 2 letter to Solicitor Bernhardt is included in the appendix to this complaint as Exhibit 40.)

93. Although Mr. Bernhardt initially scheduled a meeting for January 18, he cancelled on January 17, stating that in lieu of meetings, the Park Service would respond to Circle Line's concerns when addressing questions submitted in connection with the prospectus. *See* Ltr. D. Bernhardt to R. Gasaway (Jan. 17, 2007). (A copy of Solicitor Bernhardt's January 17 letter to Mr. Gasaway is included in the appendix to this complaint as Exhibit 39.)

94. Circle Line responded with a letter noting that the issues it wished to discuss were legal in nature. Circle Line's letter stated that if the Solicitor was "comfortable with going forward with a discussion," it would welcome the opportunity to meet in an effort to resolve the outstanding legal issues. This invitation, too, was not accepted. *See* Ltr. R. Gasaway to D. Bernhardt (Jan. 25, 2007). (A copy of Mr. Gasaway's January 25 letter to Soilcitor Bernhardt is included in the appendix to this complaint as Exhibit 36.)

95. Around the same time, in questions submitted to the Park Service on January 16, 2007, Circle Line referenced the materials it had previously provided to the Park Service, and asked the Park Service to respond to its submissions and provide a legal justification for its solicitation decisions.

96. In addressing Circle Line's request that the Park Service disclose the letter from Blount Boats, Inc. indicating that the current seven-vessel fleet would cost approximately $44 million to replace, the Park Service published Circle Line's question and stated:

> The NPS hereby discloses this information. The NPS does not concur with any of the statements embedded in this question.

97. In addressing Circle Line's request that the Park Service provide the basis for its estimate of the value of Circle Line's vessels, and explain the methodology used to estimate their value, the Park Service stated:

> The NPS is not required to and will not release value estimates for individual items or other data used to make the NPS estimate of Required Initial Investment prepared to comply with 36 C.F.R. § 51.5(d) beyond what is provided in the Business Opportunity, pp. 31-2, and Appendices F and G. See the Business Opportunity, p. 31: "It is the responsibility of Offerors to make their own estimates of the compensation that must be paid to the Existing Concessioner under the terms of the Existing Contract."

98. Apart from its statements made in response to questions, the Park Service provided no other substantive response to Circle Line's submissions and legal analyses.

**Specific Allegations Relevant To The Park Service's Forced Rollback In Real Fares**

99. The 1998 Act mandates that "[e]ach concessions contract shall permit *the concessioner* to set reasonable and appropriate rates and charges for facilities, goods, and services provided to the public," subject to the Park Service's approval. 16 U.S.C. § 5955(a) (emphasis added).

100. The 1998 Act further requires that, although a concessioner's rates and charges are "subject to approval" by the Park Service, the approval process "shall be as prompt and unburdensome to the concessioner as possible and shall rely on market forces ... to the maximum extent practicable." *Id.* § 5955(b).

101. The 1998 Act further directs that the Park Service "shall approve rates and charges" that are "reasonable and appropriate." *Id.* The rates set by the concessioner, and approved by the Park Service, "may not exceed the market rates and charges for comparable facilities, goods, and services." *Id.*

102. Unless the concessioner voluntarily agrees to a different approach by contract, the Park Service is required to compare a concessioner's proposed rates "with those rates and charges for facilities, goods, and services of comparable character under similar conditions, with due consideration to the following factors and other factors deemed relevant by the Secretary: length of season, peakloads, average percentage of occupancy, accessibility, availability and costs of labor and materials, and type of patronage." *Id.*

103. The Park Service's prospectus fails to comply with the aforementioned statutory requirements.

104. Although Park Service consultants told Circle Line's President in 2005 that the market could justify an adult ticket price of more than $15, the prospectus lowers and freezes adult passenger fares for three full years at $12. *See* Ltr. R. Gasaway to C. Garrett (Mar. 15, 2007). (A copy of Mr. Gasaway's March 15 letter to Ms. Garrett is included in the appendix to this complaint as Exhibit 35.)

105. On January 25, 2007, Circle Line submitted a report to Pam McLay, the Park Service official responsible for preparing the prospectus, explaining in detail the legal problems with the Park Service's attempt to freeze ticket fares for three years at a pre-determined, below-market rate, and deprive the concessioner of its statutory right to propose and gain approval of reasonable and appropriate rate adjustments. *See* Ltr. R. Gasaway to P. McLay (January 25,

2007). (A copy of Mr. Gasaway's letter to Ms. McLay is included in the appendix to this complaint as Exhibit 38.)

106. In addition, Circle Line submitted questions in response to the solicitation asking the Park Service to justify its legal position. Circle Line's questions emphasized that if inflation occurred at the same pace it had occurred in the past, according to Park Service calculations, by 2011 real ticket prices would be $3 less than the reasonable and appropriate rates determined by the Park Service under the current contract.

107. The questions submitted by Circle Line also emphasized that the Park Service's proposed Island Cruise is a close cousin to the harbor cruise that Circle Line currently runs separate and apart from its Park Service concession. As of today, the Circle Line harbor cruise charges $15 for an adult ticket. The prospectus nonetheless foresees a reduction in fares by $3.00 to $12, even though Circle Line's current service uses the same vessels, equipment, crews, and departure point as would be employed in providing the new proposed Island Cruise.

108. In response to these and other questions, the Park Service stated that it had "collected and analyzed all available applicable data while preparing the Prospectus." Answer Set No. 3, at 13. (A copy of the Park Service's third response to questions is included in the appendix to this complaint as Exhibit 9.) The Park Service also suggested that it had gathered internal information and completed analyses for purposes of soliciting the business opportunity. But the Park Service refused to disclose this information:

> Internal information and analyses performed by the NPS for purposes of soliciting this business opportunity will not be provided to prospective Offerors. ....
>
> Internal information and analyses regarding expected inflation during the term of the Draft Contract that were performed by the NPS for the purposes of soliciting this business opportunity will not be provided to prospective Offerors.

*Id.*

109. In response to Circle Line's concerns that the Park Service lacks authority to force concessioners to agree to the terms of a concessions contract that mandates that the concessioner relinquish its statutory right to set reasonable and appropriate rates, the Park Service merely stated:

> In the interest of fostering the broadest possible patronage of the Park, the NPS elected to establish rates and charges by contract in accordance with the National Park Service Concessions Management Improvement Act of 1998. Section 406(b) cited in the question begins "Unless otherwise provided in a concession contract … ."

*Id.* at 12-13.

110. Apart from its responses to questions, the Park Service provided no other reasoning, rationale, or justification for its fare freeze and no other substantive response to the extensive legal analyses submitted by Circle Line.

## INJUNCTIVE RELIEF

111. Circle Line is entitled to injunctive relief because it can show a likelihood of success on the merits of its claims, and both the public interest and a balancing of potential harms weigh decidedly in favor of preserving the status quo, suspending the current submission due date for receiving proposals, and enjoining the Park Service from proceeding with its unlawful solicitation.

112. Circle Line is also entitled to injunctive relief because there is no adequate legal remedy for any of the claims asserted herein. Unless enjoined, the defendants' actions and conduct will cause irreparable harm to Circle Line, as a potential bidder and the existing, incumbent concessioner, whose rights are being illegally invaded by unlawful, arbitrary and capricious government agency action.

a. Under the terms of the prospectus, all bidders must accept all the terms and conditions of the solicitation to have their bid deemed responsive. Accordingly, unless it is enjoined, the prospectus will subject Circle Line to an unacceptable Hobson's choice: consent to the prospectus's unlawful terms, or forgo bidding to continue the business it has operated for more than 50 years.

b. Moreover, if Circle Line is required to submit a proposal before the Court adjudicates its claims, Circle Line will be irreparably harmed because it will be immediately deprived of the substantial benefit it enjoys as a result of having specifically negotiated and obtained a right of preference in renewal.

c. If the prospectus is not enjoined, Circle Line also will be irreparably harmed because it may be forced to transfer its vessels and other personal property immediately to a successor concessioner, but will not receive compensation for those assets until after a lengthy arbitration process. As a small, family-owned business, with the great majority of its assets used in connection with the concession operations, Circle Line will be forced out of business with no assets and no money to support the arbitration.

d. If the prospectus is not enjoined, Circle Line will lose its right to a legally valid procurement and lose anticipated profits.

e. The Park Service will not be harmed by the issuance of a preliminary injunction. Circle Line, as the incumbent contractor, is ready, willing, and able to continue to perform under the terms of the existing contract until the Court resolves this matter. In other words, the contract services will continue to be available to the Park Service under the terms of the existing contract.

f. Nor will any prospective bidder or any third party be harmed by the issuance of a preliminary injunction. To the contrary, prospective bidders will benefit by the resolution of the open questions raised by Circle Line prior to submitting their final bid to the Park Service. These issues present critical questions that significantly affect the value of the proposed contract. There is no good reason to make prospective bidders go through the considerable expense and inconvenience of preparing and submitting proposals on a contract that may well be subject to very significant change.

113. Circle Line is also entitled to injunctive relief because the Park Service's unlawful solicitation will injure the public's interest in preserving the integrity of the solicitation process and ensuring that the process is fair and consistent with the requirements of law.

## CAUSES OF ACTION

114. Section 12 of the ADRA amends the Tucker Act to clarify the jurisdiction of this Court and the nature of its review in "bid protest" matters. Section 12(a)(3) (entitled "BID PROTESTS"), is codified in 28 U.S.C. § 1491(b)(1), and provides as follows:

> [T]he United States Court of Federal Claims ... shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. [T]he United States Court of Federal Claims ... shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

115. Section 12(a)(4) of ADRA, codified at 28 U.S.C. § 1491(b)(4) of the Tucker Act, provides that, in any bid protest action brought pursuant to section 1491, the court "shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."

116. Section 706 of title 5 provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706.

117. Once a violation of ADRA (as amending the Tucker Act) is found, "the court[] may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).

**COUNTS I-IV: RIGHT OF PREFERENCE IN RENEWAL**

118. Circle Line re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 117 of this Complaint as if fully set forth herein.

119. In setting the terms and conditions for awarding the next concessions contract for ferry service at the Statue of Liberty and Ellis Island, the Park Service is bound by certain laws, including the 1998 Act.

120. The 1998 Act deprives the Park Service of authority to breach the terms of Circle Line's 1989 contract, including any contractual right of preference. Section 415 of the 1998 Act specifically states that the repeal of the 1965 Act "shall not affect the validity of any concessions contract or permit entered into under" that statute, 16 U.S.C. § 20 note, and that the 1998 Act does not apply "to the extent [its] provisions are inconsistent with the terms and conditions of" such a contract. *Id.*

121. Under its 1989 contract with the Park Service, Circle Line enjoys an implied right of preference in the renewal of its contract to provide ferry concession services to the Statue of Liberty and Ellis Island.

122. Circle Line's right of preference in renewal is based, among other things, on (1) contemporaneous and continuing conduct, oral statements, and written statements by Circle Line and the National Park Service establishing a mutual agreement that Circle Line's current contract contains an implied right of preference in renewal; and (2) legally sufficient consideration provided by Circle Line in exchange for the right of preference, including (a) forgoing three years owed on its 1982 concessions contract; (b) forgoing legal rights and remedies arising out of the Park Service's actions under the 1982 contract and Circle Line's associated financial losses; and (c) Circle Line's substantial investment in and improvement of existing concessions operations.

**COUNT I**
**Tucker Act and Administrative Dispute Resolution Act**
**Claims For Violation of Concession Laws**
**(Violation of the 1998 Act, And Arbitrary, Capricious,**
**And Unlawful Deprivation Of Right Of Preference)**

123. Circle Line re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 122 of this Complaint as if fully set forth herein.

124. Under the terms of the preferential right of renewal included in Circle Line's existing contract, because Circle Line has performed its concession duties satisfactorily under its 1989 contract, it is entitled to have an opportunity to match the best competing offer for the renewal of the concession contract.

125. Although Circle Line has satisfactorily performed its duties under its 1989 concessions contract, the Park Service's prospectus denies the existence of Circle Line's

preferential right of renewal. In particular, the prospectus states that the Park Service has determined that "no preferred offeror for this contract exists."

126. By issuing a prospectus that denies Circle Line its right of preference in renewal, the Park Service has violated the 1998 Act and acted in a manner that is arbitrary and capricious, "not in accordance with law," and "in excess of its statutory jurisdiction and authority" under applicable concession laws. *See* 16 U.S.C. § 5951, *et seq.*; 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2).

127. In explaining its determination not to honor Circle Line's right of preference, the Park Service has stated that, in accordance with its regulations, "'[i]t is the final decision of the Director … that holders of 1965 Act concession contracts are not entitled to be given a renewal preference with respect to such contracts …' unless the 1965 Act concession contract makes express reference to such a preference. 36 C.F.R. § 51.102(a)." The Park Service goes on to say that its regulations were upheld by the District of Court for the District of Columbia and the Court of Appeals for the District of Columbia in the *Amfac* litigation. Finally, the Park Service states its unconditional conclusion that "[b]ecause the Existing Concession Contract does not contain an express provision regarding a preference in the renewal of the Contract, the Director has determined that no Preferred Offeror for the new concession contract exists in accordance with 36 C.F.R. § 51.102." Answer Set No. 2, at 1-2.

128. The Park Service's reading of the D.C. Circuit's decision in *Amfac* is demonstrably inaccurate and constitutes an arbitrary and capricious basis for refusing to honor Circle Line's right of preference in renewal.

129. In *Amfac*, the D.C. Circuit specifically held that, although the Park Service's regulation is facially valid, the regulation could be unlawful if it were applied to deprive a

particular concessioner of an implied-in-fact contractual provision. *See Amfac*, 282 F.3d at 829. The D.C. Circuit determined, contrary to the Park Service's position, that individual concessioners are entitled to prove that they reached a meeting of the minds with the Park Service that, in light of surrounding circumstances, reflected their mutual understanding that the right of preference would be protected under their concession contract.

130. The Park Service's misreading of *Amfac* and its blanket refusal to recognize implied rights of preference in renewal is arbitrary and capricious, contrary to law, and lacking any rationale basis.

131. To redress this violation of law, Circle Line requests that the Court hold unlawful and set aside the unlawful prospectus, enjoin the bidding process until such time as the prospectus is made lawful, and order the Park Service to comply fully with all applicable legal requirements.

**COUNT II**
**Tucker Act and Administrative Dispute Resolution Act**
**Claims For Violation of Concession Laws**
**(Arbitrary And Capricious Violation Of Park Service Regulations)**

132. Circle Line re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 122 of this Complaint as if fully set forth herein.

133. Although Circle Line's contract gives it an implied right to match the best competing offer for the renewal of the concession contract, the Park Service's prospectus states that the Park Service has determined that "no preferred offeror for this contract exists." Prospectus, Proposal Instructions, at 4. (A copy of the Prospectus, Proposal Instruction si included in the appendix to this complaint as Exhibit 2.)

134. In explaining its determination not to honor Circle Line's right of preference, the Park Service has stated that, in accordance with its regulations, "'[i]t is the final decision of the

Director … that holders of 1965 Act concession contracts are not entitled to be given a renewal preference with respect to such contracts …' unless the 1965 Act concession contract makes express reference to such preference. 36 C.F.R. § 51.102(a)." The Park Service states its unconditional conclusion that "[b]ecause the Existing Concession Contract does not contain an express provision regarding a preference in the renewal of the Contract, the Director has determined that no Preferred Offeror for the new concession contract exists in accordance with 36 C.F.R. § 51.102." Answer Set No. 2, at 1-2.

135. The Park Service's unconditional refusal to recognize implied rights of preference in renewal constitutes an arbitrary misconstruction and misapplication of 36 C.F.R. § 51.102(a), which by its plain text requires the Park Service to follow the ruling of any court of competent jurisdiction that decides that Circle Line possesses an implied right of preference under the 1965 Act.

136. The Park Service's regulations, 36 C.F.R. § 51.102(c), provide:

> The Director, similarly, will permit any holder of a 1965 Act concession contract that a court of competent jurisdiction determines in a final order is entitled to a renewal preference, for any reason, to exercise a right of preference in accordance with the otherwise applicable requirements of this part, including, without limitation, the requirement for submission of a responsive proposal pursuant to the terms of an applicable prospectus.

137. In refusing to recognize any right of preference that is not express in nature, the Park Service has contravened the requirements of its own regulations.

138. Alternatively, if the National Park Service's interpretation of 36 C.F.R. § 51.102 as applied to this solicitation process is deemed correct, then its regulations are *ultra vires* under the 1998 Act, which explicitly preserves rights of preference of all kinds.

139. In the case, if the Park Service's interpretation of 36 C.F.R. § 51.102 is indeed correct, the regulations must be declared invalid by this Court. *See* 28 U.S.C. § 1491(b)(4) ("To

the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of agency action").

140. The Park Service's decision is arbitrary and capricious, contrary to law, and lacking any rationale basis.

141. To redress this violation of law, Circle Line requests that the Court hold unlawful and set aside the unlawful prospectus, enjoin the bidding process until such time as the prospectus is made lawful, and order the Park Service to comply fully with all applicable legal requirements.

**COUNT III**
**Tucker Act and Administrative Dispute Resolution Act**
**Claims For Violation of Concession Laws**
**(Arbitrary And Capricious Burden On Holders Of Implied Rights Of Preference)**

142. Circle Line re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 122 of this Complaint as if fully set forth herein.

143. Although Circle Line's contract gives it an implied right to match the best competing offer for the renewal of the concession contract, the Park Service's prospectus states that the Park Service has determined that "no preferred offeror for this contract exists." Prospectus, Proposal Instructions, at 4.

144. In explaining its determination not to honor Circle Line's right of preference, the Park Service has stated that, in accordance with its regulations, "'[i]t is the final decision of the Director … that holders of 1965 Act concession contracts are not entitled to be given a renewal preference with respect to such contracts …' unless the 1965 Act concession contract makes express reference to such preference. 36 C.F.R. § 51.102(a)." The Park Service states its unconditional conclusion that "[b]ecause the Existing Concession Contract does not contain an

express provision regarding a preference in the renewal of the Contract, the Director has determined that no Preferred Offeror for the new concession contract exists in accordance with 36 C.F.R. § 51.102." Answer Set No. 2, at 1-2.

145. The Park Service's interpretation of its regulations as precluding it from recognizing implied rights of preference unless ordered to do so by a court of competent jurisdiction violates the due process rights, equal protection rights, and rights to be free of arbitrary agency decisions possessed by Circle Line or any other holder of implied rights of preference. There can be no rational reason for an agency to recognize that a court can adjudicate the question of whether an implied right of preference exists, but for the agency nevertheless to refuse to adjudicate the same question on its own. Likewise, there can be no rational reason for a government agency to take the position that it will recognize express rights of preference voluntarily, but implied rights of action only under judicial compulsion.

146. The Park Service's regulatory approach imposes an improper differential procedural burden on the exercise of implied rights of preference, which were saved by Congress in the 1998 legislation, that is not similarly borne by a party possessing an express right of preference.

147. The Park Service's interpretation of its regulations is accordingly arbitrary and capricious, not in accordance with law, and not in observance of procedure required by law.

148. To redress this violation of law, Circle Line requests that the Court hold unlawful and set aside the unlawful prospectus, enjoin the bidding process until such time as the prospectus is made lawful, and order the Park Service to refrain from imposing arbitrary and capricious or otherwise unlawful burdens on concessioners entitled to an implied right of preference in renewal under their existing concession contracts.

**COUNT IV**
**Tucker Act and Administrative Dispute Resolution Act**
**Claims For Violation of Concession Laws**
**(Violation of Contractual Commitments)**

149. Circle Line re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 122 of this Complaint as if fully set forth herein.

150. Circle Line objects to the Park Service's solicitation on the basis of a prior contractual commitment of the United States. *See* 28 U.S.C. § 1491(b); United States, Department of the Interior, National Park Service, Circle Line–Statue of Liberty Ferry, Inc., Statue of Liberty National Monument, Contract No. CC-STLI0001-89 (executed Aug. 15, 1989) (as amended).

151. Circle Line's contract with the Park Service satisfies all of the required elements to establish a contract with the United States: (1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) actual authority by a representative of the government to bind it in contract. It is also clear that the United States has proceeded without complaint for nearly 20 years on the basis that it has a contract with Circle Line.

152. Under the Tucker Act generally, the Park Service's failure to recognize, enforce, and disclose Circle Line's right of preference in renewal in the context of the solicitation for a new contract violates the Park Service's contractual commitments, threatening Circle Line with numerous types of damages, including irreparable injury, such as loss of the Statue of Liberty/Ellis Island Ferry Contract, the forced closure of its business, loss of profits, loss of employees, loss of property, forced sale of property at below-market rates, and consequential damages arising thereunder.

153. This Court should therefore declare the extent of Circle Line's contractual rights and the proper interpretation thereof, hold unlawful, enjoin, and set aside the unlawful

prospectus, enjoin the bidding process until such time as the prospectus is made lawful, order the National Park Service on remand to unequivocally recognize and enforce Circle Line's implied right of preference in renewal, and inform prospective bidders that Circle Line has indicated that it intends to exercise its right of preference at its sole discretion.

154. Only those forms of relief will compel the Park Service to acknowledge its legal obligations not only to Circle Line, but to other prospective offerors on the new contract, who should not be permitted to bid in ignorance, or without a full appreciation, of the right of preference in renewal Circle Line possesses. Bidding strategies for both the incumbent and new bidders must be grounded on a level playing field of a shared and previously announced legal understanding of the terms on which the new contract will ultimately be awarded.

155. The Court should award any appropriate damages stemming from the Park Service's unlawful derogation of Circle Line's right of preference, along with any damages related to bid preparation and proposal costs, as well as any other ancillary relief that is deemed just and proper.

**COUNTS V-VII: TRANSFER OF CIRCLE LINE'S ASSETS**

156. Circle Line re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 117 of this Complaint as if fully set forth herein.

157. Circle Line's contract provides that Circle Line will sell property "used or held for use" in concession operations in the event it is not awarded the next concessions contract for ferry service to the Statue of Liberty and Ellis Island. The Contract further requires that, in the event of a dispute over the value of the property, the value will be set through binding arbitration. *Id.* at § 12.

158. The National Park Service, as a contractual partner of Circle Line, is required to make all discretionary determinations it possesses under the existing contract in accordance with law, including with respect to issues of asset transfer in accord with the applicable duties of good faith and fair dealing.

**COUNT V**
**Tucker Act and Administrative Dispute Resolution Act**
**Claims For Violation of Concession Laws**
**(Arbitrary and Capricious Procedures For Estimating The Value Of Circle Line's Assets And Refusal To Disclose Relevant Information)**

159. Circle Line re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 117 and paragraphs 156 through 158 of this Complaint as if fully set forth herein.

160. The Park Service's prospectus estimates that Circle Line's seven vessels are worth only $18,732,000, and that its other inventory and non-marine personal property are worth only $708,000.

161. The Park Service contends that these estimates are non-binding and are only estimates, but they remain estimates that cannot be verified by prospective offerors, who have no right to access or inspect Circle Line's vessels or other assets.

162. In 2002, before recent and significant increases in boat-building prices, Park Service officials internally estimated that Circle Line's seven vessels used in the concession operations were worth between $25 and $30 million. *See* Email J. Swofford to M. Rust, et al. (Feb. 27, 2002). (A copy of Mr. Swofford's email to M. Rust is included in the appendix to this complaint as Exhibit 50.)

163. More recently, Circle Line obtained a letter from Blount Boats, Inc., the company that built six of Circle Line's seven vessels used in connection with the concession operations.

The Blount Boats letter indicates that today it would cost approximately $44 million — in the range of $41.74 million to $46.5 million — to replace Circle Line's seven vessels. This cost estimate would cover only the seven ferry vessels themselves, not Circle Line's fireboat (which is stationary and used solely for maintenance), Circle Line's land-based assets, or any associated marine property that the Park Service is seeking to transfer to a successor concessioner in the event Circle Line is not awarded the next contract.

164. The Park Service has stated that, in estimating the value of Circle Line's assets, its consultants did not conduct a proper appraisal, and that contrary to appropriate Department of Interior procedures the Park Service failed to submit its consultants analyses and estimates to the Department of the Interior's Office of Appraisal Services.

165. Notwithstanding the above, the Park Service has refused to release the basis for its value estimates to prospective bidders.

166. Because the prospectus's estimates of the value of Circle Line's assets differ from the Park Service's own earlier internal estimates, differ from third-party estimates in the record, and are supported by no record evidence, and were developed via a departure from the Department of Interior's appraisal practices, the prospectus's terms are false, misleading, incomplete, arbitrary and capricious, and the prospectus's requirements will inevitably impede full and open competition.

167. To redress this violation of law, Circle Line requests that the Court hold unlawful and set aside the unlawful prospectus, enjoin the bidding process until such time as the prospectus is made lawful, and order the Park Service to establish lawful procedures for estimating the value of Circle Line's assets, including properly disclosing to all prospective bidders the basis for its value estimates.

**COUNT VI**
**Tucker Act and Administrative Dispute Resolution Act**
**Claims For Violation of Concession Laws**
**(Arbitrary Refusal to Interpret the Existing Contract's**
**Asset Transfer Procedures and Disclose That Interpretation to All Bidders)**

168. Circle Line re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 117 and paragraphs 156 through 158 of this Complaint as if fully set forth herein.

169. The Park Service correctly notes in its response to questions that Circle Line posed the following question:

> The Existing Concessioner has submitted a legal analysis to the Park Service demonstrating that, even if the Park Service enjoyed authority to order asset transfers to occur in advance of payment (which it does not), the Park Service would need to establish that: (1) an immediate, pre-payment transfer of title, possession, or use of the Existing Concessioner's assets is justified under the traditional four-part equitable balance test for mandatory injunctions; (2) that ordering an immediate transfer of assets accords with equity; (3) that the successor concessioner would be required to pay into an escrow account, from which the Existing Concessioner could immediately withdraw, an amount equal to the Park Service's estimate of the fair value of the Existing Concessioner's assets subject to transfer; and (4) that the acquiring successor concessioner would be required to secure an adequate bond to relieve the Existing Concessioner of the risk that the successor would become insolvent before the final amount of just compensation is established and paid upon final arbitration of the value of the Existing Concessioner's transferred assets. Does the Park Service agree with this analysis? If not, why not?

Answer Set No. 2, at 20-21.

170. In response to the questions and legal analysis setting forth Circle Line's interpretation of the contract's requirements, the Park Service responded with the following:

> Negotiation between the Existing Concessioner and any succeeding Concessioner will be completed pursuant to the Existing Contract (See Prospectus Appendix A). The Existing Concessioner's legal analyses do not reflect the position of the NPS.

*Id.* at 20.

171. This bare explanation for the Park Service's decision does not put forth the Park Service's own interpretation of the existing contract with respect to how assets will be transferred from Circle Line to a successor in the event Circle Line is not awarded the new contract.

172. The Park Service cannot ignore good-faith legal questions and arguments set before it by Circle Line and state only that it disagrees with those interpretations. Instead, as a matter of law, the agency is obligated to provide a reasoned explanation for its decision, including addressing the important questions posed and substantial legal positions advanced by Circle Line.

173. The question of which procedure the Park Service intends to follow in terms of an asset transfer to a new successor concessioner is an important aspect of the problem that the Park Service faces in designing a solicitation process that accords with constitutional, statutory, regulatory, and administrative case law.

174. Ignoring this issue prejudices both Circle Line and any potential successor concessioner. If the Park Service awards the new contract to a concessioner other than Circle Line and attempts to order immediate asset transfer prior to a settlement or concluded arbitration as to asset value, the Park Service will face opposition from Circle Line, including potential litigation or resistance to an asset-transfer request. Such litigation or an inability to obtain access to the assets necessary to operate under the new contract not only would impose unnecessary and unlawful costs on Circle Line, but also would harm the incoming concessioner and park visitors. Failing to disclose these considerations threatens to conceal or obscure important material information relevant to the solicitation process.

175. The prospectus and the solicitation process are legally flawed and the Park Service is acting arbitrarily and capriciously in withholding its interpretation of the existing contract as it bears on asset-transfer issues.

176. To redress this violation of law, Circle Line requests that the Court hold unlawful and set aside the unlawful prospectus, enjoin the bidding process until such time as the prospectus is made lawful, and order the Park Service to specify lawful procedures for the transfer of Circle Line's assets in the event Circle Line is not awarded the next contract, and then to fully disclose those procedures to all prospective bidders.

**COUNT VII**
**Tucker Act and Administrative Dispute Resolution Act**
**Claims For Violation of Concession Laws**
**(Request For Declaration Of Rights Under The**
**Asset-Transfer Provisions Of Circle Line's Existing Contract)**

177. Circle Line re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 117 and paragraphs 156 through 158 of this Complaint as if fully set forth herein.

178. Section 12 of the existing contract describes the asset-transfer process agreed to between Circle Line and the National Park Service in the event of expiration or termination of the contract. In relevant respects, the existing contract provides in Section 12 as follows:

> Section 12. COMPENSATION. (a) Just Compensation: The compensation described herein shall constitute full and just compensation to the Concessioner from the Secretary for all losses and claims occasioned by the circumstances described below.
>
> (b) Contract expiration or termination where operations are to be continued: If for any reason, including contract expiration or termination as described herein, and subject to the limitation on compensation [for unsatisfactory performance], the Concessioner shall cease to be required by the Secretary to conduct the operations authorized hereunder, or substantial part thereof, and, at the time of such event the Secretary intends for substantially the same or similar operations to be continued by

> a successor, whether a private person, corporation or agency of the government, (i) the Concessioner will sell and transfer to the successor designated by the Secretary its possessory interest in CONCESSIONER and GOVERNMENT IMPROVEMENTS, if any, as defined under the this contract, and all other property of the Concessioner used or held for use in connection with such operations; and (ii) the Secretary will require such successor, as a condition to granting of a contract to operate, to purchase from the Concessioner such possessory interests, if any, and such other property, and to pay the Concessioner the fair value thereof.
>
> * * *
>
> If the Concessioner and the successor, excepting government agencies, cannot agree upon the fair value of any item or items, either party may serve a request for arbitration upon the other party, and the fair value of the item or items in question shall be determined by the majority vote of a board of three arbitrators .... * * * Before reaching its decision, the board [of arbitrators] shall give each of the parties a fair and full opportunity to be heard on the matters in dispute.
>
> If the successor is a government agency and there is a dispute as to the fair value of any possessory interest, or other items, an advisory arbitration panel will be established at the request of the Concessioner (one member to be selected by the Secretary, one by the concessioner, and the third by agreement of the original two) for the purpose of recommending to the Secretary an appropriate fair value. The Secretary and the Concessioner shall share equally the expenses of such advisory arbitration. The written decision of the Secretary as to such fair value will be final and binding upon all parties. * * *

179. Section 12(a) of the contract's reference to "just compensation" and the bifurcation in the binding arbitration for disputes between Circle Line and an incoming private concessioner as opposed to advisory arbitration for disputes between Circle Line and an incoming government concessioner demonstrate that the contract was written with sensitivity to the legalities and fairness requirements of the Takings Clause of the United States Constitution. *Compare* U.S. CONST. amend. V.

180. Nowhere does Section 12(b), which describes the process for transitioning assets from Circle Line to any incoming concessioner, authorize the Secretary of Interior to order an immediate transfer of assets if (1) Circle Line and the incoming concessioner are engaged in

settlement discussions and neither has requested the appointment of an arbitrator; or (2) before an arbitration requested by either Circle Line or the incoming concessioner is complete. Section 12(b) simply requires Circle Line to sell its assets and for the incoming concessioner to agree to buy them at a fair price.

181. The Park Service's statement in its prospectus that a new concessioner will be expected to commence operations by September 17, 2007, however, suggests that the Park Service is expecting that the arbitration and valuation process will be initiated and completed *after* the date that the Park Service would seek to compel Circle Line to transfer its vessels and other assets to a successor concessioner.

182. Circle Line prays for a declaratory judgment, issued in accord with the Tucker Act, construing the existing contract to make clear the following points:

- In making any discretionary determination under the contract, including making the determination under Section 12(b) that Circle Line must transfer its assets to an incoming concessioner and that the incoming concessioner must purchase those assets, the Park Service and the Department of the Interior is bound by the duties of good faith and fair dealing. The Park Service and the Department of the Interior may not make discretionary determinations that unduly advantage the government, or treat unfairly or with favoritism the interests of either Circle Line or any successor concessioner.
- The existing contract must be construed to provide for compensation that is procedurally and substantively consistent with the requirements of the Fifth Amendment's Takings Clause, and not for compensation that is procedurally at odds with that provision or deficient in amount.

- Section 12 of the contract does not confer on the Secretary or the Park Service the ability to unilaterally order Circle Line to transfer its assets to an incoming concessioner, but rather requires that a transfer of assets may not occur in advance of the point when Circle Line and the successor either agree on a proper sales price for any assets whose valuation is in dispute, or that same matter is resolved under the arbitration process set forth in Section 12(b).

183. Circle Line asserted its interpretation of the contract in various letters and other forms of correspondence with the Park Service, and the National Park Service in response to questions has rejected Circle Line's position, albeit for reasons that are in many respects unstated. *See* National Park Service, Answer Set No. 2, at 17-20 (questions #85-#98); *see especially id.* at 19 (question #98) ("The NPS does not concur with any of the statements [construing the contract] embedded in this question.").

184. In response to the questions and legal analysis setting forth Circle Line's interpretation of the contract's requirements, the Park Service responded with the following:

> Negotiation between the Existing Concessioner and any succeeding Concessioner will be completed pursuant to the Existing Contract (See Prospectus Appendix A). The Existing Concessioner's legal analyses do not reflect the position of the NPS.

Answer Set No. 2, at 20.

185. Circle Line is entitled to a declaration of the points set forth above concerning the existing contract because of the presence of an actual controversy concerning its interpretation and application to the pending solicitation process, both under the Tucker Act generally (28 U.S.C. § 1491(a)(2), and under the ADRA (28 U.S.C. § 1491(b)(2)).

186. The Court should award any appropriate damages for breach of contract, along with any damages related to bid preparation and proposal costs, as well as any other ancillary relief that is deemed just and proper.

**COUNTS VIII-IX: RATE FREEZE**

187. The Park Service's authority to approve concessioner rates is governed by section 406 of the 1998 Act.

188. Section 406(a) provides that "[e]ach concessions contract shall permit the concessioner to set reasonable and appropriate rates and charges for facilities, goods, and services provided to the public, subject to approval under subsection (b)."

189. Section 406(b) requires approval of a concessioner's rates by the Secretary of the Interior, who must employ a process "as prompt and unburdensome to the concessioner as possible," "rely[ing] on market forces to the maximum extent practicable," with reasonableness and appropriateness "determined primarily by comparison with those rates and charges for facilities, goods, and services of comparable character under similar conditions."

190. The Park Service, through its prospectus, unilaterally directs that the following fares will apply under the new contract: "$12.00 Adult, $10.00 Senior, $5.00 Child. Fares will remain constant until 2011."

191. The prospectus requires all prospective bidders to accept this schedule of fares and binds the winning concessioner to this schedule of fares. *See* Solicitation Number STLI001-07 ("[t]he Prospectus will explain the business opportunity and the terms and conditions under which the NPS will award the concession contract.").

## COUNT VIII
### Tucker Act and Administrative Dispute Resolution Act
### Claims For Violation of Concession Laws
### (Arbitrary, Capricious, And Unlawful Violation Of Statutory Requirements)

192. Circle Line re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 117 and paragraphs 186 through 190 of this Complaint as if fully set forth herein.

193. The Park Service's solicitation process is legally objectionable and arbitrary and capricious because it proceeds in contravention of the statutory requirement that concessioners shall be permitted to set just and reasonable rates.

194. The Park Service's fare rollback and associated freeze until the year 2011 is arbitrary and capricious, in excess of its statutory jurisdiction and authority, constitutes an abuse of discretion, and is otherwise not in accordance with law:

- The Park Service has not authority to unilaterally impose a fare schedule under the 1998 Act;
- The Park Service's unilateral imposition of below market rates purports to take place without arms-length negotiation and agreement of the succeeding concessioner, as required by the 1998 Act;
- The rate-setting process employed does not take account of prevailing market conditions;
- The rate freeze until 2011 does not take account of prevailing market conditions, or potential conditions prevailing from the consummation of the contract through 2011;
- The Park Service has not disclosed that its fare schedule represents a rollback of the rates that should prevail;

- The Park Service offers no rationale for imposing below-market rates and freezing rates outside of its statutory authority.

195. The Court should hold unlawful and set aside the unlawful Prospectus, enjoin the bidding process until such time as the Prospectus is made lawful, order the Park Service to refrain from engaging in a rate setting process for which it lacks authority, including the imposition of below market rates or the freezing of such rates in a manner that fails to take account of prevailing market conditions and lacks appropriate negotiations between the Park Service and the succeeding concessioner.

**COUNT IX**
**Tucker Act and Administrative Dispute Resolution Act**
**Claims For Violation of Concession Laws**
**(Unexplained Departure From Precedent And Agency Procedures)**

196. Circle Line re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 117 and paragraphs 186 through 190 of this Complaint as if fully set forth herein.

197. The Park Service's standard contract and policy documents provide that the Park Service is supposed to "review and approve concessioner rates" through and "analytical process" that produces "defendable results" and reflects "the competitive marketplace." NPS Rate Approval Guide, at 6. (A copy of the Park Service's Rate Approval Guide, which is part of the Park Service's prospectus, is included in the appendix to this complaint as Exhibit 5.)

198. The Park Service has recognized six methods available to determine appropriate rates, but none has been used in connection with the prospectus for ferry service to the Statue of Liberty and Ellis Island.

199. None of the recognized methods available to determine appropriate rates permits the Park Service to freeze rates so as to guarantee that, taking inflation into account, real rates steadily decrease over time.

200. The Park Service has provided no explanation why freezing rates until 2011 is reasonable and justified by an analysis of rates for comparable service.

201. The Park Service has provided no explanation why inflation is unlikely to occur from 2007 through 2011, or why it is appropriate to freeze rates without permit reasonable adjustments to take account of inflation.

202. The Court should hold unlawful and set aside the unlawful Prospectus, enjoin the bidding process until such time as the Prospectus is made lawful, order the Park Service to refrain from engaging in a rate setting process for which it lacks authority, including the imposition of below market rates or the freezing of such rates in a manner that fails to take account of prevailing market conditions and lacks appropriate negotiations between the Park Service and the succeeding concessioner.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Circle Line requests that the Court:

A. Enter a preliminary injunctive relief pending final resolution of this matter suspending the date for submission of proposals and barring the defendants, their officers, employees and agents, from implementing or enforcing any of the unlawful aspects of the prospectus and bidding process contemplated therein.

B. Enter a permanent injunction enjoining defendants from issuing a new prospectus for ferry service to the Statue of Liberty and Ellis Island that is deficient in any of the ways

described in this complaint, or otherwise infringes Circle Line's rights in the manner described in this complaint.

C. Enter a declaratory judgment that the prospectus and solicitation process contemplated therein are in the respects described above arbitrary, capricious, contrary to constitutional right, power, privilege or immunity, in excess of statutory jurisdiction, authority or limitations, contrary to concession contracting laws, including but not limited to the 1998 Act, an abuse of discretion, and otherwise not in accordance with law.

D. Vacate any agency action found to be arbitrary, capricious, an abuse or discretion or otherwise not in accordance with law, and remand any matters herein to the National Park Service or Department of the Interior for further proceedings in accord with any legal instructions the Court may deem proper and just.

E. Order such other and further relief as the Court deems appropriate.

Respectfully submitted,

Robert R. Gasaway
*Counsel of Record*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

OF COUNSEL:

Robert S. Ryland
Jeffrey B. Clark
Ashley C. Parrish
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

OF COUNSEL:

Raymond G. McGuire
KAUFF MCCLAIN & MCGUIRE LLP
950 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 644-1010
Facsimile: (212) 644-1936

OF COUNSEL:

Edward J. Boyle
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
150 East 42nd Street
New York, NY 10017
Telephone: (212) 490-3000
Facsimile: (212) 490-3038

*Attorneys for Circle Line–Statue of Liberty Ferry, Inc.*

April 16, 2007

**VERIFICATION**

I swear under penalty of perjury that the statements contained in this Verified Complaint are true to the best of my knowledge, information, and belief.

CIRCLE LINE–STATUE OF LIBERTY FERRY, INC.

By: ______________________
J.B. Meyer, President