FILED
APR 16 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

| | |
|---|---|
| CIRCLE LINE – STATUE OF LIBERTY FERRY, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 07-237 C<br><br>Judge: ____________ |

# CIRCLE LINE'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rules 65(a) and 65(b) of the Rules of the Court of Federal Claims, plaintiff, CIRCLE LINE-STATUE OF LIBERTY FERRY, INC. ("Circle Line"), hereby moves this Court for a temporary restraining order and preliminary injunction staying the bid response date of April 27, 2006 on Solicitation Number STLI001-07, and enjoining the defendant, its officers, agents, employees, and/or representatives from accepting proposals in response to, or making a contract award under, Solicitation Number STLI1001-07, pending a hearing on the merits and final disposition of this action or until further order of this Court.

As additional grounds for this motion, and as set forth more fully in the accompanying Verified Complaint, supporting exhibits, and the Memorandum in Support of this Application and Motion, Circle Line states as follows:

1. On December 28, 2006, the United States, through the National Park Service, U.S. Department of Interior, issued Solicitation Number STLI1001-07 for a new ten-year concessions contract for the operation of ferry services to the Statue of Liberty National Monument and Ellis Island in New York Harbor.

2. Circle Line is a prospective bidder for the new concessions contract and an "interested party" objecting to the Park Service's solicitation within the meaning of 28 U.S.C. § 1491(b). *See Advanced Sys. Tech., Inc. v. United States*, 69 Fed. Cl. 474, 482 (2006) (the statute is "clear that the Court has jurisdiction over ... an action objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award of a contract, *i.e.*, a pre-award protest").

3. As the incumbent contractor and one of the largest operators of passenger ferry services in New York Harbor, Circle Line has a substantial chance of receiving the award of the new contract and faces substantial prejudice unless the Court grants the injunctive relief sought in this motion. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); *Asia Pac. Airlines v. United States*, 68 Fed. Cl. 8, 17 (2005).

4. The Park Service's actions in denying Circle Line's rights and its decision to move forward with the solicitation will result in significant prejudice and harm to Circle Line, including the possible loss of one of the most well-known concession contracts in the Nation after more than 50 years of service. This harm is irreparable and cannot be compensated through the award of monetary damages.

**Background**

5. The Statue of Liberty National Monument, a national park consisting of two islands (Liberty and Ellis) located in upper New York Harbor, is one of the most prominent

national treasures entrusted to the care of the National Park Service. Public access to Liberty and Ellis Islands is available only by ferry, which since 1953 has been provided by Circle Line under a series of concession contracts.

6. Circle Line's current contract became effective on April 1, 1989 and was initially due to expire on March 31, 2004. Following the events of September 11, 2001, however, the Park Service closed the concession operations for several months. And even when operations were later allowed to reopen, security restrictions imposed by the Park Service greatly limited visitor access to the Statue of Liberty. In part because of challenges posed by enhanced security requirements, and to provide more time for it to "evaluate all aspects of providing visitor services for Liberty Island and Ellis Island," the Park Service proposed, and Circle Line agreed, to extend the contract for three years to March 31, 2007. Ltr. M. Rust to K. Moran (Nov. 5, 2003) (Ex. 49) (For the Court's convenience, the exhibits supporting Circle Line's Application for a Temporary Restraining Order and Motion for Preliminary Injunction, and its Memorandum In Support have been provided in a combined appendix filed with Circle Line's complaint.)

7. On December 28, 2006, the Park Service issued its prospectus soliciting a new ten-year concessions contract for ferry service to the Statue of Liberty National Monument and Ellis Island. The prospectus states that the successful concessioner, whether the incumbent or a successor, is expected to begin operations under the new contract by September 17, 2007.

8. Beginning long before and continuing after the prospectus's release, Circle Line made numerous submissions to the Park Service to assist it in assembling an administrative record.

9. Circle Line's submissions covered a variety of topics but generally focused on three critical issues: (1) whether the Park Service would honor the implied right of preference in

renewal negotiated and guaranteed under Circle Line's current contract; (2) whether the Park Service's prospectus would accurately describe the value of Circle Line's assets and the process for transferring those assets in the event Circle Line is not awarded the next contract; and (3) whether the Park Service would comply with the statutory requirements permitting concessioners to make reasonable and appropriate adjustments in fares charged to the public.

10. The Park Service has never provided a direct, substantive response to any of the extensive materials and legal analyses that Circle Line submitted.

11. On January 16, 2007, Circle Line followed up these legal submissions by directing formal questions to the Park Service regarding its prospectus. *See* Circle Line Questions (Jan. 16, 2007) (Ex. 6). On January 30, March 2, March 16, and March 30, the Park Service's Chief of Concessions, Northeast Region, released the Park Service's answers to Circle Line's formal questions as well as similar questions submitted by others. None of those responses addressed in any detail the Park Service's basis for rejecting Circle Line's reasoned legal analyses.

12. Unless enjoined by this Court, responses to the Park Service's unlawful December 28, 2006, solicitation will be due before 4:00 p.m. on April 27, 2007.

**Overview of Circle Line's Bid Protest**

13. Circle Line has filed a nine count complaint against the United States, invoking the Court's bid protest jurisdiction under 28 U.S.C. § 1491(b) and seeking injunctive and declaratory relief. As set forth in more detail in its Verified Complaint, and as explained in the Memorandum in Support of this Application and Motion, the Park Service's solicitation is unlawful for the following reasons:

14. ***Right of Preference In Renewal.*** At the time the parties negotiated and executed the existing 1989 contract, the Park Service and Circle Line mutually agreed that Circle Line was entitled to a right of preference in renewal as a valuable part of the consideration provided under the contract.

15. As affidavits and declarations from the Park Service officials and Circle Line representatives who negotiated the 1989 contract attest, the Park Service and Circle Line mutually agreed that Circle Line would receive an implied right of preference in renewal in consideration for Circle Line's agreement to accommodate the Park Service's request that it forgo three years of operations under its 1982 contract, forgo compensation for losses suffered during the term of the contract for which the Park Service had admitted responsibility, and make the substantial investments needed to build two new vessels.

16. Circle Line is objecting to the Park Service's solicitation because it arbitrarily, capriciously, unlawfully, and without rational basis denies Circle Line its pre-existing right of preference in contract renewal.

17. ***Asset Transfer Procedures.*** Under the terms of Circle Line's existing 1989 contract, as recognized in the prospectus, if Circle Line is not awarded the next contract, the successor concessioner will be required to purchase from Circle Line all of the property (including Circle Line's seven vessels) used or held for use in connection with the concession operations.

18. Blount Boats, Inc., the company that built six of the seven vessels that Circle Line uses in connection with the ferry concession operations, has indicated that it would cost approximately $44 million — in a range of $41.75 million to $46.5 million — to replace Circle Line's seven vessels. *See* Ltr. B. Pelletier to J.B. Meyer (Dec. 20, 2006) (Ex. 41). Similarly, in

2002, long before the recent significant increases in boat building prices, Park Service officials internally estimated that Circle Line's vessels were worth between $25 and $30 million. *See* Email J. Swofford to M. Rust, et al. (Feb. 27, 2002) (Ex. 50).

19. The Park Service's prospectus, however, estimates that Circle Line's seven vessels are worth only $18,732,000, and that its other inventory and non-marine personal property are worth only $708,000.

20. The Park Service's estimate cannot be verified by prospective bidders because the Park Service has refused to release the factual basis for its own value estimates, and because prospective bidders have no right to access or inspect Circle Line's vessels or other assets. *See* Answer Set No. 2, at 18 (Ex. 8). Moreover, the Park Service admits that, in estimating the value of Circle Line's assets, it has not conducted a proper appraisal and has failed to submit its analysis to the Department of Interior's Office of Appraisal Services. *See id.*

21. Circle Line is objecting to the Park Service's solicitation because it arbitrarily, capriciously, unlawfully, and without rational basis fails to disclose the procedures the Park Service used in, and the information it relied on in, estimating the value of Circle Line's assets to be transferred to a successor concessioner in the event that Circle Line is not awarded the next contract.

22. Circle Line has submitted an extensive analysis to the Park Service explaining why the Park Service may not authorize the transfer of Circle Line's property on the timetable or in the manner contemplated in the prospectus. *See* Takings Clause Analysis (Jan. 2, 2006) (Ex. 20). As Circle Line explained, the Park Service may not seek to transfer Circle Line's vessels and other assets to a successor before Circle Line receives full payment for its property.

23. The Park Service has never substantively responded to Circle Line's legal analyses. Instead, the Park Service has merely stated that "[n]egotiations between [Circle Line] and any succeeding Concessioner will be completed pursuant to the Existing Contract" and that Circle Line's "legal analyses do not reflect the position of the NPS." Answer Set No. 2, at 19.

24. Circle Line is therefore objecting to the Park Service's solicitation because it arbitrarily, capriciously, unlawfully, and without rational basis fails to disclose the process by which Circle Line's assets will be transferred to a successor in the event Circle Line is not awarded the next contract, and fails to ensure that Circle Line will receive full and proper payment before any such transfer occurs.

25. ***Rate Freeze***. The Concessions Management Improvement Act of 1998 mandates that "[e]ach concessions contract *shall* permit the concessioner to set reasonable and appropriate rates and charges for ... services provided to the public," subject to approval by the Park Service. 16 U.S.C. § 5955(a) (emphasis added). The 1998 Act states that the Park Service's approval process "shall be as prompt and as unburdensome to the concessioner as possible," and makes clear, that "[u]nless otherwise provided in the contract, the reasonableness and appropriateness of charges shall be determined primarily by comparison with those rates and charges for ... services of comparable character." *Id.*

26. The rate-setting method required by the prospectus violates these statutory requirements. Rather than permitting the concessioner to set reasonable and appropriate rates, as Congress mandated, the prospectus seeks to freeze fares for three years (until 2011) at a fixed, below-market rate as a pre-condition for submitting an offer on the new contract. Contrary to the statutory requirements, the Park Service's prospectus mandates fares and imposes a rate-setting methodology that does not rely to the "maximum extent practicable" on "market forces."

27. In addition, the Park Service has not explained its apparent departure from prior practices or disclosed the basis for its decision. The Park Service's standard contract and policy documents, which are attached to the prospectus, make clear that the Park Service is supposed to "review and approve concessioner rates" through an "analytical process" that produces "defendable results" and reflects "the competitive marketplace." NPS Rate Approval Guide, at 6 (Ex. 5). None of the methods described in the Park Service's policy documents permit the Park Service to freeze rates so as to guarantee that, taking inflation into account, real rates steadily decrease over time.

28. Circle Line is therefore objecting to the Park Service's solicitation because it arbitrarily, capriciously, unlawfully, and without rational basis deprives the next concessioner of its statutory right to set reasonable and appropriate rates, and drains the concession as a whole of the revenue it needs to maintain current levels of service to the public by freezing passenger fares for three years at below-market rates that may not be adjusted to account for increases in inflation.

**Requirements For Issuing An Injunction**

29. Circle line will be irreparably prejudiced if it is forced to submit a responsive proposal by the April 27 deadline. Under the terms of the prospectus, all bidders must accept all the terms and conditions of the solicitation to have their bid deemed responsive. *See* Prospectus, Proposal Package, at 1 (Ex. 3). Accordingly, unless it is enjoined, the prospectus will subject Circle Line to an unacceptable Hobson's choice: consent to the prospectus's unlawful terms, or forgo bidding to continue the business it has operated for more than 50 years.

30. Moreover, if Circle Line is required to submit a proposal before the Court adjudicates its claims, Circle Line will be irreparably harmed because it will be immediately

deprived of the substantial benefit it enjoys as a result of having specifically negotiated and obtained a right of preference in renewal.

31. If the prospectus is not enjoined, Circle Line also will be irreparably harmed because it may be forced to transfer its vessels and other personal property immediately to a successor concessioner, but will not receive compensation for those assets until after a lengthy arbitration process. As a small, family-owned business, with the great majority of its assets used in connection with the concession operations, Circle Line will be forced out of business with no assets and no money to support the arbitration.

32. If the prospectus is not enjoined, Circle Line will lose its right to a legally valid procurement and lose anticipated profits.

33. The Park Service will not be harmed by the issuance of the temporary restraining order and preliminary injunction. Circle Line, as the incumbent contractor, is ready, willing, and able to continue to perform under the terms of the existing contract until the Court resolves this matter. *See* Ltr. R. Gasaway to A Conte (Apr. 11, 2007) (Ex. 52). In other words, the contract services will continue to be available to the Park Service under the terms of the existing contract.

34. Nor will any prospective bidder or any third party be harmed by the issuance of a temporary restraining order and preliminary injunction. To the contrary, prospective bidders will benefit by the resolution of the open questions raised by Circle Line prior to submitting their final bid to the Park Service. These open questions include the following: (i) whether Circle Line's right of preference will be honored; (ii) whether the basis for the Park Service's (under)estimates of the value of Circle Line's assets will be disclosed to prospective bidders; (iii) whether prospective bidders will learn whether a potential successor concessioner will be required to pay for Circle Line's assets before a transfer of those assets occurs; and (iv) whether

the next concessioner will be permitted to gain Park Service approval of reasonable and appropriate adjustments to passenger fares.

35. All of these issues present critical questions that significantly affect the value of the proposed contract. Moreover, there is no good reason to make prospective bidders go through the considerable expense and inconvenience of preparing and submitting proposals on a contract that may well be subject to very significant change.

36. As demonstrated in the accompanying memorandum, Circle Line is likely to succeed on the merits of its claims and, if denied a temporary restraining order and preliminary injunction, will have no adequate remedy at law.

37. Entering the temporary restraining order and preliminary injunction will preserve the status quo and protect the public interest in the validity of the contracting process.

38. On April 13, 2007, Circle Line gave defendant advance notice of its intention to file this application and motion in accordance with Appendix C of the Rules of this Court.

WHEREFORE, Circle Line requests this Court to enter a temporary restraining order and to issue a preliminary injunction in accordance with the proposed Order.

Respectfully submitted,

Robert R. Gasaway
*Counsel of Record*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Attorney for plaintiff*
*Circle Line–Statue of Liberty Ferry, Inc.*

April 16, 2007

**ADDITIONAL COUNSEL:**

OF COUNSEL:

Raymond G. McGuire
KAUFF MCCLAIN & MCGUIRE LLP
950 Third Avenue, 14th Floor
New York, N.Y. 10022
Telephone: (212) 644-1010
Facsimile: (212) 644-1936

OF COUNSEL:

Edward J. Boyle
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
150 East 42nd Street
New York, N.Y. 10017
Telephone: (212) 490-3000
Facsimile: (212) 490-3038

OF COUNSEL:

Robert R. Ryland
Jeffrey B. Clark
Ashley C. Parrish
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Attorneys for Circle Line–Statue of Liberty Ferry, Inc.*

April 16, 2007

FILED
APR 16 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

| | |
|---|---|
| CIRCLE LINE – STATUE OF LIBERTY FERRY, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 07-237 C<br><br>Judge: ________ |

# MEMORANDUM IN SUPPORT OF CIRCLE LINE'S MOTION FOR A PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

OF COUNSEL:

Raymond G. McGuire
KAUFF MCCLAIN & MCGUIRE LLP
950 Third Avenue, 14th Floor
New York, N.Y. 10022
Telephone: (212) 644-1010
Facsimile: (212) 644-1936

OF COUNSEL:

Edward J. Boyle
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
150 East 42nd Street
New York, N.Y. 10017
Telephone: (212) 490-3000
Facsimile: (212) 490-3038

Robert R. Gasaway
*Counsel of Record*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

OF COUNSEL:

Robert S. Ryland
Jeffrey B. Clark
Ashley C. Parrish
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Attorneys for Circle Line–Statue of Liberty Ferry, Inc.*

Dated: April 16, 2007

## TABLE OF CONTENTS


INTRODUCTION .......... 1

STATEMENT OF ISSUES .......... 2

STATEMENT OF THE CASE .......... 3

FACTUAL BACKGROUND .......... 5

A. The Concessions Policy Act of 1965 .......... 5

B. Circle Line's Current Concessions Contract .......... 6

1. The Background to Circle Line's 1989 Contract. .......... 7

2. The Park Service's Assurances. .......... 8

C. The Concessions Management Improvement Act Of 1998 .......... 10

1. The Relevant Provisions Of The 1998 Act .......... 10

2. The D.C. Circuit's *Amfac* Decision .......... 11

D. The Park Service's Extension Of Circle Line's Contract .......... 12

E. The Park Service's Prospectus Soliciting A New Concessions Contract At The Statue Of Liberty National Monument .......... 13

1. Circle Line's Submissions To The Administrative Record .......... 14

2. The Park Service's Response To Questions .......... 17

LEGAL STANDARD .......... 19

ARGUMENT .......... 20

I. The Balance Of Equities Weigh Decidedly In Favor Of Entering A Preliminary Injunction. .......... 20

A. Circle Line Will Suffer Irreparable Prejudice And Injury If The Court Does Not Enter A Preliminary Injunction. .......... 21

B. The Government Will Suffer No Harm If The Court Enters A Preliminary Injunction. .......... 23

II. Circle Line Is Likely To Prevail On The Merits Of Its Claims. .......... 25

A. Circle Line is Likely To Prevail On The Merits Of Its Claims Relating To Its Right Of Preference In Renewal .......... 26

1. The Park Service's Decision Not To Recognize Circle Line's Right Of Preference Lacks Any Rational Basis .......... 26

2. Circle Line's Implied Right Of Preference In Renewal Must Be Honored By The Park Service .......... 27

B. Circle Line Is Likely To Prevail On The Merits Of Its Claims Concerning The Transfer Of Circle Line's Assets To A New Concessioner. ........29

1. The Park Service's Gross Undervaluation Of Circle Line's Assets Improperly Interferes With Full And Open Competition. ........30

2. The Park Service's Prospectus Is Invalid Because The Park Service Has Arbitrarily Failed To Respond To Concerns Raised By Circle Line. ........31

3. The Park Service's Solicitation Is Unlawful Because It Impermissibly Fails To Make Clear The Requirements For Transferring Circle Line's Assets. ........33

C. The Park Service's Mandatory Decrease In Inflation-Adjusted Passenger Fares Violates The Statutory Requirements And Constitutes An Unexplained Departure From Precedent. ........35

1. The Park Service's Rate Freeze Violates The 1998 Act Because It Invades The Concessioner's Right To Set Reasonable And Appropriate Rates. ........35

2. The Park Service's Rate Freeze Is Arbitrary And Capricious Because The Park Service Has Not Adequately Explained Its Departure From Precedent. ........38

III. A Preliminary Injunction Is In The Public Interest. ........39

CONCLUSION ........40

## TABLE OF AUTHORITIES

**Cases**

*511 West 232nd Owners Corp. v. Jennifer Realty Co.*,
729 N.Y.S.2d 34 (N.Y. App. Div. 2001) .......... 28

*A.G. Schoonmaker Co. v. Resor*,
445 F.2d 726 (D.C. Cir. 1971) .......... 40

*Advanced Sys. Tech., Inc. v. United States*,
69 Fed. Cl. 474 (2006) .......... 24, 39

*Advanced Tech. Sys. Tech., Inc. v. United States*,
69 Fed. Cl. 474 (2006) .......... 25

*Aetna Ins. Co. v. Kennedy*,
301 U.S. 389 (1937) .......... 34

*Alanthus Data Commc'ns. Corp.*,
B-206946, 1983 WL 26452 (Comp. Gen. Feb. 10, 1983) .......... 39

*Alvin Ltd. v. U.S. Postal Serv.*,
816 F.2d 1562 (Fed. Cir. 1987) .......... 29

*Alvin Ltd. v. United States Postal Serv.*,
816 F.2d 1562 (Fed. Cir. 1987) .......... 28

*Amfac Resorts, LLC v. U.S. Department of Interior*,
282 F.3d 818 (D.C. Cir. 2002) .......... 9, 11, 12, 18, 26, 27

*Arch Chemicals, Inc. v. United States*,
64 Fed. Cl. 380 (2005) .......... 31

*Asia Pac. Airlines v. United States*,
68 Fed. Cl. 8 (2005) .......... 21, 25, 30

*Associated Producers Co. v. City of Independence, Mo.*,
648 F. Supp. 1255 (W.D. Mo. 1986) .......... 22

*Aviation Enters., Inc. v. United States*,
8 Cl. Ct. 1 (1985) .......... 39

*Bannum, Inc. v. United States*,
404 F.3d 1346 (Fed. Cir. 2005) .......... 21

*Blinderman Constr. Co. v. United States*,
695 F.2d 552 (Fed. Cir. 1982) .......... 29

*Caldwell & Santmyer v. Glickman*,
55 F.3d 1578 (Fed. Cir. 1995) .......... 39

*California Fed. Bank v. United States*,
245 F.3d 1342 (Fed. Cir. 2001) .......... 28

*Canadian Ass'n of Petroleum Producers v. FERC*,
254 F.3d 289 (D.C. Cir. 2001) .......... 32

*Centex Corp. v. United States*,
49 Fed. Cl. 691 (2001) .......... 28

*Ceres Envtl Servs., Inc. v. United States*,
52 Fed. Cl. 23 (2002) .......... 38

*Charles H. Tompkins Co. v. United States*,
43 Fed. Cl. 716 (1999) .......... 38, 39

*Che Consulting, Inc. v. United States*,
74 Fed. Cl. 742 (2006) .......... 32

*Chrysler Motors Corp. v. Auto Body Panels, Inc.*,
908 F.2d 951 (Fed. Cir. 1990) .......... 20

*Cincom Sys., Inc. v. United States*,
37 Fed. Cl. 266 (1997) .......... 39

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .......... 32

*Columbia Gas Transmission Corp. v. FERC*,
628 F.2d 578 (D.C. Cir. 1979) .......... 36

*Custom Printing Co. v. United States*,
51 Fed. Cl. 729 (2002) .......... 33, 39

*D.H. Overmeyer Co. v. Frick Co.*,
405 U.S. 174 (1972) .......... 34

*Delta Data Sys. Corp. v. Webster*,
744 F.2d 197 (D.C. Cir. 1984) .......... 23

*Doty v. United States*,
53 F.3d 1244 (Fed. Cir. 1995) .......... 39

*Dynalectron Corp. v. United States*,
659 F. Supp. 64 (D.D.C. 1987) .......... 40

*East Tenn. Nat. Gas Co. v. Sage*,
361 F.3d 808 (4th Cir. 2004) .......... 33

*Ellsworth Assocs., Inc. v. United States*,
45 Fed. Cl. 388 (1999) .......... 23

*Essex Electro Eng'rs v. United States*,
3 Cl. Ct. 277, 287 (1983) .......... 23

*Ferry-Morse Seed Co. v. Food Corn, Inc.*,
729 F.2d 589 (8th Cir. 1984) .......... 20

*FMC Corp. v. United States*,
3 F.3d 424 (Fed. Cir. 1993) .......... 19

*George H. Whike Constr. Co. v. United States*,
140 F. Supp. 560 (Ct. Cl. 1956) .......... 29

*Great Lakes Dredge & Dock Co. v. United States*,
60 Fed. Cl. 350 (2004) .......... 24, 25

*Heartland Acad. Cmty. Church v. Waddle*,
335 F.3d 684 (8th Cir. 2003) .......... 25

*Hercules, Inc. v. United States*,
516 U.S. 417 (1996) .......... 28

*Holly Sugar Corp. v. Johanns*,
437 F.3d 1210 (D.C. Cir. 2006) .......... 36

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
52 Fed. Cl. 826 (2002) .......... 24

*International Ass'n of Firefighters v. U.S. Dep't of Navy*,
536 F. Supp. 1254 (D.R.I. 1982) .......... 40

*Interstate Gen. Gov't Contractors, Inc. v. Stone*,
980 F.2d 1433 (Fed. Cir. 1992) .......... 34

*Labat-Anderson, Inc. v. United States*,
65 Fed. Cl. 570 (2005) .......... 19

*Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*,
331 F.3d 452 (5th Cir. 2003) .......... 28

*Louisiana Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) .......... 34

*Macke Co. v. United States*,
467 F.2d 1323 (Ct. Cl. 1972) .......... 28

*Magic Brite Janitorial v. United States*,
69 Fed. Cl. 319 (2006) .......... 21

*Mark Dunning Industries v. Perry*,
890 F. Supp. 1504 (M.D. Ala. 1995) .......... 40

*Metcalf Constr. Co. v. United States*,
53 Fed. Cl. 617 (2002) .......... 21

*Midwest Mobile Diagnostic Imaging v. Dyanamics Corp. of Am.*,
965 F. Supp. 1003 (W.D. Mich. 1997) .......... 28

*Mikohn Gaming Corp. v. Acres Gaming, Inc.*,
165 F.3d 891 (Fed. Cir. 1998) .......... 20

*Minnesota Mining and Mfg. Co. v. Shultz*,
582 F. Supp. 184 (D.D.C. 1984) .......... 23

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983) .......... 32

*National Treasury Employees Union v. Chertoff*,
452 F.3d 839 (D.C. Cir. 2006) .......... 37

*National Wildlife Fed'n v. Gorsuch*,
693 F.2d 156 (D.C. Cir. 1982) .......... 28

*New York State Bar Ass'n v. FTC*,
276 F. Supp. 2d 110 (D.D.C. 2003) .......... 32

*Northern Border Pipeline Co. v. 86.72 Acres of Land*,
144 F.3d 469 (7th Cir. 1998) .......... 33

*Northern States Power Co. v. FERC*,
30 F.3d 177 (D.C. Cir. 1994) .......... 25

*O'Donnell Contr. Co. v. District of Columbia*,
963 F.2d 420 (D.C. Cir. 1992) .......... 23

*OAO Corp. v. United States*,
49 Fed. Cl. 478 (2001) .......... 23

*Ohio Bell Tel. Co. v. Public Util. Comm'n*,
301 U.S. 292 (1937) .......... 34

*Overstreet Elec. Co., Inc. v. United States*,
47 Fed. Cl. 728 (2000) .......... 23, 31

*Peter Kiewit Sons' Co. v. United States*,
109 Ct. Cl. 390 (1947) .......... 35

*PPL Wallingford Energy LLC v. FERC*,
419 F.3d 1194 (D.C. Cir. 2005) .......... 32

*Prill v. NLRB*,
755 F.2d 941 (D.C. Cir. 1985) .......... 37

*Public Serv. Comm'n v. FERC*,
397 F.3d 1004 (D.C. Cir. 2005) ........ 32

*Rotech Healthcare Inc. v. United States*,
71 Fed. Cl. 393 (2006) ........ 26

*Ryder Truck Rental, Inc. v. Cent. Packing Co.*,
341 F.2d 321 (10th Cir. 1965) ........ 28

*Sacramento Navigation Co. v. Salz*,
273 U.S. 326 (1927) ........ 28

*SAI Indus. Corp. v. United States*,
60 Fed. Cl. 731 (2004) ........ 23, 24

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ........ 37

*Semmes Motors, Inc. v. Ford Motor Co.*,
429 F.2d 1197 (2d Cir. 1970) ........ 22

*Sylvania Elec. Prods., Inc. v. United States*,
458 F.2d 994 (Ct. Cl. 1972) ........ 29

*Temple-Inland, Inc. v. United States*,
59 Fed. Cl. 550 (2004) ........ 27

*United Int'l Investigative Servs., Inc. v. United States*,
41 Fed. Cl. 312 (1998) ........ 23

*United States Ass'n of Imp.'s of Textiles and Apparel v. U.S. Dep't of Commerce*,
413 F.3d 1344 (Fed. Cir. 2005) ........ 20

*United States v. Goltra*,
312 U.S. 203 (1941) ........ 34

*United States v. Parcel of Land with Improvements Thereon in Square South of 12, Dist. of Columbia*,
100 F. Supp. 498 (D.D.C. 1951) ........ 34

*University Research Co., LLC v. United States*,
65 Fed. Cl. 500 (2005) ........ 19

*ViroMed Labs., Inc. v. United States*,
62 Fed. Cl. 206 (2004) ........ 26

*W & D Ships Deck Works, Inc. v. United States*,
39 Fed. Cl. 638 (1997) ........ 19

*Wetzel v. Edwards*,
635 F.2d 283 (4th Cir. 1980) ........ 20

*Yankee Atomic Elec. Co. v. United States*,
112 F.3d 1569 (Fed. Cir. 1997) ..... 27

*Zotos Int'l., Inc. v. Young*,
830 F.2d 350 (D.C. Cir. 1987) ..... 32

**Statutes and Rules**

16 U.S.C. § 1 ..... 5

16 U.S.C. § 20 ..... 6, 10

16 U.S.C. § 5952 ..... 10

16 U.S.C. § 5954 ..... 34

16 U.S.C. § 5955 ..... 11, 35

28 U.S.C. § 1491 ..... 19, 21, 25

36 C.F.R. § 51.102 ..... 11

5 U.S.C. § 706 ..... 25

*Concession Contract*,
65 Fed. Reg. 20,630 (Apr. 17, 2000)
(codified at 36 C.F.R. pt. 51) ..... 11

Concessions Policy Act of 1965,
Pub. L. No. 89-249, 79 Stat. 969 (Oct. 9, 1965) ..... 5

National Parks Omnibus Management Act of 1998,
Pub. L. No. 105-391, 112 Stat. 3497 (Nov. 13, 1998) ..... 10, 11

U.S. CONST., amend. V ..... 33

**Other Authorities**

Behnke, Jim & Dondis, Harold,
*The Sage Approach to Immediate Entry by Private Entities Exercising Federal Eminent Domain Authority Under the Natural Gas Act and the Federal Power Act*, 27 Energy L.J. 499 (2006) ..... 33

H. Rep. No. 105-767 (1998) ..... 10

S. Rep. No. 105-202 (1998) ..... 10

## INTRODUCTION

Circle Line–Statue of Liberty Ferry, Inc. respectfully requests that this Court enter a preliminary injunction preventing the National Park Service from proceeding with an unlawful solicitation for ferry concession services to the Statue of Liberty and Ellis Island. Unless enjoined by this Court, responses to Park Service's unlawful December 28, 2006, solicitation will be due on April 26, 2007.

The Park Service has frequently and understandably commended the service provided to national park visitors by Circle Line, the privately held, family-owned business that for 54 years has operated the ferry boats going back and forth to the Statue of Liberty. For many decades, Circle Line has consistently allowed its own, near-term financial needs to take a back seat to the needs of the visiting public. In the post-September 11 years in particular, Circle Line has been a single-stop shop for improvements to the concession, while maintaining its worldwide reputation for vessel maintenance, reliable service, and passenger safety. Circle Line, working closely with the Park Service, has turned what was once a relatively small boat concession into a crown jewel of the national park system.

But with success comes notoriety, and with notoriety comes intense public interest and scrutiny, in this case from journalists, competing ferry service operators, not-for-profit organizations, and political office-holders, among others. The most conspicuous result of unprecedented scrutiny has been an uncharacteristic Park Service unresponsiveness to legitimate questions regarding the legality of its Statue of Liberty solicitation. This silence may be due to Park Service concerns that steps taken to benefit the concession or comply with the law might be misinterpreted as steps taken to favor this or that point of view or constituency. But whatever its origins, the upshot of the Park Service's silence has been a solicitation process notably marked by missing legal explanations and violations of statutory requirements.

Unless the legal errors now appearing in the Park Service prospectus are corrected before the April 26 date for submission of bids, prospective bidders will not be able to submit meaningful and appropriate proposals. In that event, Circle Line will suffer irreparable harm, and the public's interest in full and open competition will be irretrievably compromised.

## STATEMENT OF ISSUES

1. Whether the irreparable harm that Circle Line will suffer if the Park Service's prospectus is not enjoined — including the loss of its contractual right of preference and the severe injuries associated with being forced to transfer virtually all of its property to a third party without immediate payment — outweigh the non-existent harms to the government and third parties in the event the solicitation is temporarily stayed while the Court adjudicates the issues raised in Circle Line's complaint.

2. Whether Circle Line is likely to prevail on the merits of its claims, including the following issues:

a. Whether the prospectus is unlawful because it fails to honor Circle Line's implied contractual right of preference in renewal, which was specifically agreed to by the Park Service when Circle Line executed its current contract, waived its right to compensation for losses incurred in the mid-1980s, and pledged to make further multi-million dollar investments in reliance on that right.

b. Whether the prospectus violates the law by grossly undervaluing the Circle Line vessels and other property that will be sold to the next concessioner (for its use under the next contract); improperly seeking to relieve the government and the successor concessioner from their obligation to pay before assuming title, possession, or use of Circle Line's property; and failing to describe accurately the process for transferring Circle Line's property to a successor.

c. Whether the prospectus violates the law by mandating a *decrease* in inflation-adjusted passenger fares from current levels, prevents the concessioner from exercising its statutory right to set reasonable and appropriates rates, and deprives the concession of revenue needed to maintain acceptable levels of service to the public.

3. Whether it is in the public interest for the Court to enter an injunction to preserve the integrity of the solicitation process, to adjudicate Circle Line's claims, to provide the Park Service with time to revise its unlawful solicitation, and to ensure that the solicitation furthers fair and open competition.

**STATEMENT OF THE CASE**

The Statue of Liberty National Monument, a national park consisting of two islands (Liberty and Ellis) located in upper New York Harbor, is one of the most prominent national treasures entrusted to the care of the National Park Service. Public access to Liberty and Ellis Islands is available only by ferry, which since 1953 has been provided by Circle Line under a series of concession contracts.

Circle Line's current contract became effective on April 1, 1989 and was initially due to expire on March 31, 2004. Following the events of September 11, 2001, however, the Park Service closed the concession operations for several months. And even when operations were later allowed to reopen, security restrictions imposed by the Park Service greatly limited visitor access to the Statue of Liberty. In part because of challenges posed by enhanced security requirements, and to provide more time for it to "evaluate all aspects of providing visitor services for Liberty Island and Ellis Island," the Park Service proposed, and Circle Line agreed, to extend the contract for three years to March 31, 2007. Ltr. M. Rust to K. Moran (Nov. 5, 2003) (Ex. 49).

During the contract extension, Circle Line worked closely with the Park Service to improve security and visitor services, remaining a satisfactory concessioner and receiving

recognition for its outstanding record of reliable service and passenger safety. On December 28, 2006, the Park Service issued its prospectus soliciting a new ten-year concessions contract for ferry service to the Statue of Liberty and Ellis Island.

Beginning long before and continuing after the prospectus's release, Circle Line made numerous submissions to the Park Service to assist it in assembling an administrative record. Circle Line's submissions covered a variety of topics, but generally focused on three critical issues: (1) whether the Park Service would honor the implied right of preference in renewal negotiated and guaranteed under Circle Line's current contract; (2) whether the Park Service's prospectus would accurately describe the basis for ascertaining the value of Circle Line's assets and the process for transferring those assets to a successor concessioner in the event Circle Line is not awarded the next contract; and (3) whether the Park Service would comply with the statutory requirements permitting concessioners to make reasonable and appropriate adjustments in fares charged to the public.

In addition, on or before January 16, 2007, Circle Line submitted detailed questions seeking additional information about the prospectus, and renewing its request that the Park Service provide a reasoned explanation for its final decisions. On various dates between January 30 and March 30, the Park Service released answers to the questions posed by Circle Line and others. None of those responses addressed in any detail the Park Service's basis for rejecting Circle Line's extensive legal analyses.

On April 16, Circle Line filed this bid protest. Circle Line seeks a preliminary injunction to suspend the April 27 closing date for the submission of proposals and to forbid the Park Service from proceeding with the unlawful solicitation until Circle Line's claims are fully and fairly adjudicated.

## FACTUAL BACKGROUND

The following provides a brief overview of the statutory history and requirements pertaining to the Park Service's solicitation; the terms of, and negotiations relating to, Circle Line's existing contract; Circle Line's submissions to the administrative record; and the terms of the Park Service's prospectus.

### A. The Concessions Policy Act of 1965

When Congress created the National Park Service in 1916, it charged the agency with developing the national parks for the public's enjoyment. *See* 16 U.S.C. § 1. To fulfill its statutory mission, the Park Service "lured" businesses "into the parks by offering them contractual incentives" to make the substantial investments needed to build, maintain, and operate visitor facilities. *See* NPS, Concessions Reform (Ex. 56). Perhaps the most important of these incentives was the Park Service's oft-repeated promise that, as long as they performed satisfactorily, concessioners were entitled to a right of preference in the renewal of their contracts — that is, a right to renew their contracts by matching the best competitive offer.

The Park Service recognized that concessioners who were guaranteed rights of preference when they signed their contracts were given increased prospects of earning returns on their investment through *future* contracts. *See* ROP Report, at 2-3 (Ex. 21). The Park Service further recognized that prospects for future profits induced concessioners to make immediate investments in the national parks that otherwise would not have been economically viable. *See id.* The Park Service benefited from the continuity in park operations and consistency in visitor services that occurred when experienced, incumbent concessioners enjoyed rights of preference in renewal. *See id.*

Against this regulatory backdrop, Congress passed the Concessions Policy Act of 1965, Pub. L. No. 89-249, 79 Stat. 969 (Oct. 9, 1965) ("1965 Act"). The 1965 Act codified

the Park Service's long-standing policy of granting contractual rights of renewal as an inducement for concessioners to invest in the national parks. *See id.* at 4. Section 5 of the 1965 Act thus states: "The Secretary shall encourage continuity of operation and facilities and services by giving preference in the renewal of contracts ...." 16 U.S.C. § 20d.

In implementing the 1965 Act, Park Service officials recognized that the right of preference was a powerful bargaining tool and that, without that right, investment in the nation's parks would substantially decrease. *See* ROP Report, at 5-6. High-level officials often told concessioners that their contracts included implied preferential rights, and emphasized that they "could only be deprived" of these rights "if they failed to perform satisfactorily under their contracts." *Id.* By making these binding promises, the Park Service induced concessioners to sign contracts requiring them to make investments in their concession operations that otherwise would not have been economically prudent, and concessioners routinely performed beyond the letter of their contracts to ensure that their performance remained "satisfactory." *Id.*

### B. Circle Line's Current Concessions Contract

For the last half-century, Circle Line has operated ferry concession services at the Statue of Liberty under successive contracts with the National Park Service. Under the terms of these contracts, Circle Line has been required to make multi-million dollar investments in the concession operations, including building vessels to exacting specifications mandated by the Park Service. Circle Line's current contract requires that its seven vessels, together with its other assets "used or held for use" in connection with the concession operations, must be purchased by the successor concessioner in the event the next contract is not awarded to Circle Line. *See* Prospectus, Bus. Opp., at 31 (Ex. 1). Circle Line's contract includes an implied right of preference in renewal, which the parties specifically negotiated and agreed upon when they executed the contract in 1989.

### 1. The Background to Circle Line's 1989 Contract.

On September 8, 1982, Circle Line and the Park Service entered into a ten-year contract under which Circle Line agreed to provide ferry services to the Statue of Liberty and Ellis Island covering the period from April 1, 1982 through March 31, 1992. *See* J. Moran Aff. ¶ 8 (Ex. 27). The 1982 contract required Circle Line to make substantial investments, including purchasing a new vessel and improving designated facilities and services. *See id.* ¶¶ 8-9. Unfortunately, the Park Service failed to disclose material facts about the 1982 contract. Unbeknownst to Circle Line, when the Park Service solicited the 1982 contract, it had already decided that it would shut down concession operations to complete massive renovations to the Statue of Liberty. *See id.* ¶ 10. In 1984, the Park Service closed the Statue of Liberty's crown and its external viewing areas, and in 1985 closed Ellis Island to make renovations to the Great Hall. *See id.* ¶ 12. Then, from June 24, 1985 through July 5, 1986, the Park Service required Circle Line to discontinue its concession operations and cease providing ferry services under its contract. *See id.*

Circle Line suffered millions of dollars in losses as a result of the Park Service's unilateral decision to shut down concession operations. *See id.* ¶¶ 13-15. The Park Service acknowledged its responsibility for Circle Line's losses, *see id.* ¶¶ 15-16, but recognized that when the park reopened it would need Circle Line to invest in new vessels to satisfy increased visitor demand. *See id.* ¶ 24. Although the Park Service at first agreed to compensate Circle Line by waiving franchise fee payments and extending Circle Line's contract, it ultimately changed course (in the words of its own Regional Director, "repudiating more than two years of good faith negotiations"), telling Circle Line that it intended to solicit a new contract with a fifteen-year term. *See id.* ¶¶ 16-18; *see also* H. Cables Decl. ¶¶ 3-4 (Ex. 25).

On June 22, 1988, the Park Service published in the Federal Register a notice of intent to negotiate a new concessions contract. *See* Moran Aff. ¶ 19. The Park Service's formal Statement of Requirements, which the Park Service told Circle Line included all "the requirements and conditions" under which it "propose[d] to continue the operation," stated that, if awarded the contract, the new concessioner would enjoy a right of preference in renewal. *Id.* ¶¶ 20-21. Apart from emphasizing the right of preference, the Statement of Requirements noted that if Circle Line were awarded the new contract, it would be required to give up three years on its existing contract. *See id.* ¶ 23. The Statement of Requirements also made clear that the next concessioner would be required to build or purchase two large vessels and make other improvements to the concession operations. *See id.* ¶ 25.

Circle Line agreed to cooperate with the Park Service for the benefit of the visitors and the overall concession operation. Given the terms of the solicitation, however, it was important that the new contract include the right of preference in renewal. *See id.* ¶¶ 26-30. Without a guaranteed right of preference, Circle Line would not have been willing (or economically able) to accommodate the Park Service's request that it forgo three years of its existing contract, forgo compensation for losses suffered during the term of that contract, expand its operations, or make the substantial investments needed to build two new vessels. *See id.* ¶¶ 28, 30. Circle Line also would not have been willing to accept the Park Service's repudiation of its commitment to extend the contract and reduce franchise fees. *See id.*

### 2. The Park Service's Assurances.

Circle Line and its counsel made a point of confirming with the Park Service the mutual understanding that Circle Line would be entitled to exercise its right of preference at the end of the contract. *See id.* ¶¶ 35-38; *see also* Cables Decl. ¶¶ 5-6. Circle Line accepted and relied on these assurances that the right of preference would be protected under, and impliedly included in, the successor to its 1982 concessions contract. *See* Moran Aff. ¶ 38.

Circle Line's counsel, George B. Hartzog, Jr, a highly regarded former Park Service director, was acutely aware of the possibility that Congress might amend the law to deprive concessioners of their statutory entitlement to rights of preference. *See* G. Hartzog Aff. ¶ 4 (Ex. 26). Mr. Hartzog knew that, even as Congress enacted the 1965 Act, a minority of its members "started expressing doubt about the soundness of the Interior Department's contracting policies, particularly the financial incentives it was giving concessioners." *Amfac Resorts, LLC v. U.S. Department of Interior*, 282 F.3d 818, 821 (D.C. Cir. 2002) (citation omitted). Mr. Hartzog also knew that, for years after its enactment, Congress repeatedly considered replacing the Act with new legislation. *See* ROP Report, at 4-5.

Given the persistent requests that Congress amend the 1965 Act, the Park Service's contracting officials would often reassure individual concessioners that the right of preference was included as an implied, unwritten term in particular concession contracts executed under the 1965 Act. Accordingly, Mr. Hartzog contacted Park Service officials and asked them to confirm that the right of preference was protected under Circle Line's concessions contract. *See* Moran Aff. ¶ 36. In response, Mr. Hartzog was told that it was not necessary to include the right of preference as an *express* contractual term. *See id.* According to the Park Service, "because both sides understood that Circle Line would be entitled to the right of preference in renewal, there was no basis for modifying the language of the Park Service's standard form contract to expressly mention" the right. Moran Aff. ¶ 36; *see also* Cables Decl. ¶¶ 5-6; Hartzog Aff. ¶ 5. The Park Service told Circle Line that, although both sides mutually agreed that Circle Line would enjoy a right of preference in renewal under its 1989 contract, including the right as an express term would have required the Park Service to reopen contentious debates over the standard form contract, which would have seriously inconvenienced the Park Service. *See* Moran Aff. ¶ 36.

### C. The Concessions Management Improvement Act Of 1998

On November 13, 1998, the President signed into law the Concessions Management Improvement Act of 1998 ("1998 Act"), included as sections 401-419 of the National Parks Omnibus Management Act of 1998, Pub. L. No. 105-391, 112 Stat. 3497 (Nov. 13, 1998).

#### 1. The Relevant Provisions Of The 1998 Act

In the 1998 Act, Congress mandated that contracts for large concessions issued under the Act would not include renewal rights. Section 403(7)(A) provides that, with limited exceptions, "the Secretary shall not grant a concessioner a preferential right to renew a concessions contract, or any other form of preference to a concessions contract." 16 U.S.C. § 5952(7)(A).

Congress nonetheless refused to renege on commitments made to existing concessioners. The 1998 Act's savings provision, section 415, bars retroactive application of the 1998 Act in any way that would modify the terms — express or implied — of existing 1965 Act contracts. Specifically, section 415 states that the 1998 Act does not "affect the validity of any concessions contract" entered into under the 1965 Act, and that the 1998 Act would not apply to existing contracts "to the extent [it is] inconsistent with" those contracts. 16 U.S.C. § 20 note.

Significantly, earlier versions of the savings clause proposed by the Senate provided that the 1998 Act would apply to all existing concessions contracts, "except to the extent such provisions are inconsistent with the *express* terms and conditions" of those contracts. S. Rep. No. 105-202, at 11 (1998) (emphasis added). The limitation to express terms was removed by the House Committee, and the savings clause as enacted protects all "terms and conditions" of the 1965 Act contracts, not just express ones. *See* H. Rep. No. 105-767, at 13 (1998), 16 U.S.C. § 20 note.

The 1998 Act also contains provisions mandating that "each concessions contract shall permit *the concessioner* to set reasonable and appropriate rates and charges for facilities, goods, and services provided to the public," subject to Park Service approval. 16 U.S.C. § 5955(a) (emphasis added). The 1998 Act does *not* grant the Park Service authority to fix rates *sua sponte*; instead, it provides that a concessioner's rates are "subject to approval" by the Park Service, via an approval process that "shall be as prompt and unburdensome to the concessioner as possible." *Id.* § 5955(b).

**2. The D.C. Circuit's Amfac Decision**

In April 2000, the Park Service promulgated final regulations implementing the 1998 Act. *See Concession Contract*, 65 Fed. Reg. 20,630 (Apr. 17, 2000) (codified at 36 C.F.R. pt. 51). The final regulations embodied an across-the-board refusal to recognize implied contractual rights granted by the Park Service, and preserved by Congress, under 1965 Act contracts. The Park Service's regulations provide: "In circumstances where a 1965 Act concession contract does not make *express* reference to a preference in renewal, it is the final administrative decision of [the Park Service] ... that the repeal of the 1965 Act's preference in renewal by the 1998 Act is applicable to holders of 1965 Act concession contracts." 65 Fed. Reg. 20,630, 20,664 (Apr. 17, 2000) (emphasis added); *see also* 36 C.F.R. § 51.102.

In *Amfac Resorts, LLC v. U.S. Department of Interior*, several concessioners challenged the Park Service's across-the-board refusal to honor implied contract terms. Rejecting the concessioners' *facial* challenge, the D.C. Circuit held that, under the 1965 Act, the Park Service was not required to "insert a preferential right of renewal clause in *all* concession contracts." 282 F.3d 818, 825 (D.C. Cir. 2002) (emphasis added). Concluding that the right of preference was not a mandatory term automatically included in every 1965 Act contract, the D.C. Circuit emphasized that it was not passing judgment on whether individual contracts might include a right of preference as a bargained-for, but unwritten,

term. *See id.* at 828. Because government contracts may contain implied terms, the D.C. Circuit held that if a pre-1998 contract included an implied preferential right of renewal, the 1998 Act's savings clause would preserve it. *See id.* at 829. Its decision made clear that individual concessioners are entitled on a case-by-case basis to prove they reached a meeting of the minds with Park Service officials, as "inferred from the 'conduct of the parties showing, in light of the surrounding circumstances,'" their mutual understanding that a right of preference was an unwritten term in their contract. *Id.*

**D. The Park Service's Extension Of Circle Line's Contract**

Working closely with the Park Service, Circle Line's concession operations expanded under its 1989 contract. In 1989, Circle Line had transported fewer than 2.7 million passengers to Liberty and Ellis Islands; from 1996 to 2001, it transported, on average, more than 4 million passengers each year, with visitation reaching a record 4.3 million in 2000.

The attacks of September 11, 2001, dramatically changed things. The Park Service closed Liberty and Ellis Islands, pending a comprehensive security review that suspended concession operations for over three months. Even after the park reopened and New York tourism grew to exceed pre-2001 levels, the Park Service's temporary security arrangements continued to deter visitation to the Statue of Liberty.

Circle Line responded by putting aside its own immediate financial concerns and rallying to the Park Service's side. Circle Line helped diffuse criticism of the Park Service's careful pacing of the reopening of Liberty Island by starting a new harbor tour to accommodate visitors who wanted close-up, vessel-deck views of the closed-down Statue of Liberty. Circle Line also helped identify potential long-term embarkation arrangements for the concession operations. At no cost to the government, Circle Line provided the Park Service with extensive reports on security and emergency evacuation procedures, and, when the Statue of Liberty eventually reopened, helped develop a state-of-the-art reservation

system. *See, e.g.*, Security Access Report (Jan. 14, 2002) (Ex. 24); Evacuation Report (Feb. 13, 2002) (Ex. 23); Ltr. K Moran to C. Garrett (July 8, 2004) (Ex. 48).

Accordingly, even though Park Service consultants determined that Circle Line suffered at least $8.2 million in economic losses resulting from the Park Service's access restrictions, Circle Line took a longer-term perspective and, because it enjoyed a right of preference in renewal, continued to make substantial investments in the concession operations. With Circle Line's assistance, the Park Service gradually improved security procedures and increased access to Liberty and Ellis Islands. *See, e.g.*, Pier A Report (Feb. 22, 2005) (Ex. 22).

In late 2003, the Park Service determined that it would not "be able to issue a new long-term concession contract ... prior to the current contract's expiration on March 31, 2004." Ltr. M. Rust to K. Moran (Nov. 5, 2003) (Ex. 49). To gain more time to "evaluate all aspects of providing visitor services for Liberty Island and Ellis Island," the Park Service proposed, and Circle Line agreed, to extend the contract for three years. *Id.* Except for changing the contract's expiration date, the parties agreed that "[a]ll other terms and conditions of the contract" would "remain the same." *Id.*

More recently, on March 9, 2007, the Park Service asked to further extend Circle Line's contract. Circle Line's contract is now scheduled to expire on October 1, 2007 or "until such time as a new contract" is awarded, "whichever occurs first." Ltr C. Walter to K. Moran (Mar. 9, 2007) (Ex. 18). Once more, apart from the new expiration date, the parties agreed that "[a]ll other terms and conditions "of the contract" would "remain the same." *Id.*

### E. The Park Service's Prospectus Soliciting A New Concessions Contract At The Statue Of Liberty National Monument

On December 28, 2006, the National Park Service issued its prospectus soliciting a new ten-year concessions contract. The prospectus fails to honor the parties' agreement that Circle Line would be entitled to a right of preference in renewal. It also fails to comply with

applicable statutory and regulatory requirements relating to the transfer of Circle Line's vessels (and other personal property) and to the establishment of passenger fares.

**1. Circle Line's Submissions To The Administrative Record**

Starting before and continuing after the Park Service released its prospectus, Circle Line took special care to provide the Park Service with appropriate materials for an administrative record supporting the issuance of a prospectus.

For example, Circle Line was concerned from the outset that, although boat builders have estimated that in today's market it would cost between $41.75 million and $46.5 million to replace Circle Line's seven-vessel fleet, *see* Ltr. B. Pelletier to J.B. Meyer (Dec. 20, 2006) (Ex. 41), the Park Service would not appropriately disclose the value of Circle Line's assets to prospective bidders. In the Spring of 2006, Circle Line suggested that the parties "collaborate to remove to the greatest extent possible any source of unnecessary delay, expense, or litigation of the type that has characterized other recent NPS concession contract awards involving valuable properties." Ltr. R. Gasaway to A. Conte (May 11, 2006) (Ex. 47). In particular, to avoid unnecessary disputes over the value of Circle Line's assets, Circle Line suggested that the Park Service "agree to amend the contract so as to provide for a full and fair appraisal of Circle Line's property ... *before* the Park Service releases the solicitation." *Id.* (emphasis in original). Circle Line hoped that this process would yield "a fixed figure that could be solidly relied upon by any and all bidders for the next concessions contract," and avoid the problems in other recent solicitations where Park Service-appointed appraisers had significantly undervalued the incumbent concessioner's assets. *Id.*; *see also* Ltr. R. Gasaway to A. Conte (May 26, 2006) (Ex. 46).

When the Park Service declined to accept this proposal, Circle Line suggested a different approach, offering to have its experts meet with the Park Service's appraisers to

discuss the assumptions and methodologies used in valuing Circle Line's assets. The Park Service declined this invitation as well.

Notwithstanding its inability to secure a working accommodation on the asset transfer issue, Circle Line made similar overtures regarding its right of preference. On August 31, 2006, and September 11, 2006, Circle Line submitted a report to the Park Service. *See* Ltr. R. Gasaway to J. Pendry (Aug. 31, 2006) (Ex. 43); Ltr. R. Gasaway to J. Pendry (Sept. 11, 2006) (Ex. 42). The report included over 400 pages of documents, including numerous declarations from concessioners and former Park Service officials. Perhaps most significantly, Circle Line attached to its report an affidavit from George B. Hartzog, who served as Circle Line's attorney in the discussions leading up to the execution of the 1989 contract, and a declaration from Herbert S. Cables, the Park Service's Regional Director from 1982 to 1989, who was responsible for negotiating the contract. Mr. Cables and Mr. Hartzog both state that it was the mutual understanding of the Park Service and Circle Line that Circle Line's contract included an implied right of preference as a valuable part of the consideration provided under the contract. *See* Hartzog Aff. ¶ 5; Cables Decl. ¶¶ 5-6.

In addition, the report included an affidavit from Circle Line's Joseph A. Moran, who participated in the negotiations over the terms of the 1989 contract. *See* Moran Aff. ¶ 3. Mr. Moran testifies in his affidavit that, in consideration for Circle Line's agreement to build two new vessels, forgo three years of operations under its previous 1982 contract, and not pursue litigation for damages arising out of the Park Service's forced suspension of the concession operations, the Park Service agreed and assured Circle Line that the contract included an implied right of preference. *See id.* ¶¶ 26-38.

The Park Service never substantively responded to these submissions. Instead, on December 28, 2006, the Park Service released its prospectus, which states without elaboration: "no Preferred Offeror for this Draft Contract exists pursuant to the terms of 36

CFR Part 51." Prospectus, Bus. Opp. at 2 (Ex. 1). In addition, the prospectus includes the Park Service's estimate that Circle Line's assets, including its seven vessels, are worth only $19.44 million. *See id.* at 32. Although the prospectus indicates that the new contract is "expected to begin on September 17, 2007," it fails to describe the requirements pertaining to the transfer of assets if Circle Line is not awarded the contract. Finally, although the Park Service determined in 2005 that the market could justify an adult ticket price of more than $15, *see* Ltr. R. Gasaway to C. Garrett (Mar. 15, 2007) (Ex. 35), the prospectus freezes adult passenger fares for three full years at $12.

Concerned that the prospectus would mislead prospective bidders, Circle Line immediately sent a packet of materials to the Solicitor for the Department of the Interior, requesting "an opportunity to meet" at his earliest convenience. *See* Ltr. R. Gasaway to D. Bernhardt (Jan. 2, 2007) (Ex. 40). Circle Line enclosed its analysis of the right of preference issue. It also forwarded a detailed analysis addressing the prospectus's misleading description of the value of Circle Line's assets and its failure to make clear that Circle Line's assets could be transferred to a new concessioner only after their precise dollar value is set and Circle Line is paid in full.

Nonetheless, the Solicitor declined to discuss the situation with Circle Line stating that, in lieu of meetings, the Park Service would respond to Circle Line's concerns when addressing questions submitted in connection with the prospectus. *See* Ltr. D. Bernhardt to R. Gasaway (Jan. 17, 2007) (Ex. 39). Circle Line responded by emphasizing that the issues it wished to discuss were legal in nature. *See* Ltr. R. Gasaway to D. Bernhardt (Jan. 25, 2007) (Ex. 36). Having clarified its request, Circle Line made clear that if the Solicitor was "comfortable with going forward with a discussion," it would welcome an opportunity to meet in hopes of resolving the outstanding legal issues. *Id.* This invitation, too, was not accepted.

Around the same time, on January 16, Circle Line submitted to the Park Service a list of detailed questions about the prospectus. *See* Circle Line Questions (Jan. 16, 2007) (Ex. 6). Circle Line's questions largely focused on contractual or operational issues that had not been adequately addressed. In addition, Circle Line inquired about the Park Service's attempt to force concessioners to agree to a freeze in the rates paid by park visitors. *See id.* at 31-35. Circle Line noted that if inflation occurred at the same pace it had occurred in the recent past, according to Park Service calculations, by 2011 real ticket prices would be $3 less than the rates determined by the Park Service to be reasonable and appropriate under the current contract. *See id.* at 34.

On January 25, 2007, having received no substantive response to its submissions, Circle Line sent the right of preference report directly to the Park Service's Director, Mary Bomar. *See* Ltr. R. Gasaway to M. Bomar (Jan. 25, 2007) (Ex. 37); *see also* Ltr. R. Gasaway to P. McLay (Jan. 25, 2007) (Ex. 38). On the same day, Circle Line submitted a report to Pam McLay, the Park Service official responsible for overseeing the prospectus, explaining in detail the legal issues presented by the Park Service's attempt to freeze ticket fares for four years at a pre-determined, below-market rate, and to take away the concessioner's statutory right to propose and gain approval of reasonable and appropriate rate adjustments. *See* Ltr. R. Gasaway to P. McLay (Jan. 25, 2007) (Ex. 38). Circle Line received no response to these two letters.

**2. The Park Service's Response To Questions**

On or about January 30, March 2, and March 16, the Park Service released its final responses to questions concerning the prospectus. Unfortunately, the responses provide little by way of additional explanation for the Park Service's administrative decisions. The three critical issues on which Circle Line had submitted hundreds of pages of analysis and documentary support received no more than terse, one-paragraph responses.

***Right of Preference.*** With respect to the right of preference issue, the Park Service stated that, because Circle Line's contract "does not contain an express provision regarding a preference in renewal ... no Preferred Offeror for the new concession contract exists." Answer Set No. 2, at 1-2 (Ex. 8). The Park Service cited its regulations and noted that they had been upheld against a facial challenge by the D.C. Circuit. *See id.* The Park Service declined to address the portions of the D.C. Circuit's *Amfac* decision making clear that concessioners are entitled on a case-by-case basis to prove that a meeting of the minds was reached with Park Service officials as to individual concession contracts. *Amfac*, 282 F.3d at 829-30.

***Asset Transfer Issues.*** The Park Service provided a similar response to Circle Line's concerns that it had greatly undervalued Circle Line's assets, merely stating that it "does not concur" with Circle Line's position. Answer Set No. 2, at 19. The Park Service refused to disclose the methodology or release any information used to estimate the value of Circle Line's assets, asserting that the Park Service "is not required to and will not release value estimates." *Id.* at 18-20. That failure is notable, for in 2002, long before the recent significant increases in boat building prices, Park Service officials internally estimated that Circle Line's vessels were worth between $25 and $30 million. *See* Email J. Swofford to M. Rust, et al. (Feb. 27, 2002) (Ex. 50). The Park Service's responses did not state what had caused its value estimates to decline over a five-year period featuring rapid inflation in the costs of designing and constructing large vessels.

In response to Circle Line's legal analysis demonstrating that its assets may not be transferred to a successor until compensation is paid in full, the Park Service merely observed that Circle Line's "legal analyses do not reflect the position of the NPS." Answer Set No. 2, at 20.

***Forced Reduction In Rates.*** Finally, the Park Service provided no meaningful response to Circle Line's analysis showing that the Park Service lacks legal authority to force concessioners, as a pre-condition to submitting a responsive offer, to give up their right to propose reasonable and appropriate adjustments in fares. *See* Answer Set No. 3, at 13 (Ex. 9). Nor did the Park Service address Circle Line's concerns that the proposed, mandatory rate freeze would violate the Park Service's own policies. *See id.* Perhaps most significantly, although the Park Service admitted that it had collected information and performed analyses that purportedly supported its fare-freeze determination, the Park Service refused to disclose that information to prospective offerors. *See id.*

## LEGAL STANDARD

This Court has authority in a bid protest action under 28 U.S.C. § 1491(b) to "award any relief" that it "considers proper," including "injunctive relief." *Labat-Anderson, Inc. v. United States*, 65 Fed. Cl. 570, 576 (2005); *University Research Co., LLC v. United States*, 65 Fed. Cl. 500, 504 (2005). In deciding whether to enter a preliminary injunction, the Court considers four factors: (1) the threat of irreparable injury to the moving party; (2) the balance between this harm and the injury (if any) that granting the injunction might inflict on the government or third parties; (3) the probability that the moving party will succeed on the merits; and (4) the public interest. *See, e.g., FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *see also W & D Ships Deck Works, Inc. v. United States*, 39 Fed. Cl. 638, 647 (1997) ("the same four-part test" applies to motions for a preliminary injunction as motions for a temporary restraining order). None of the individual factors comprising the four-factor test, standing alone, is determinative; instead, the factors are flexible and evaluated on a sliding scale — "the weakness of the showing regarding one factor may be overborne by the strength of the others." *Chrysler Motors Corp. v. Auto Body Panels, Inc.*,

908 F.2d 951, 953 (Fed. Cir. 1990); *United States Ass'n of Imp.'s of Textiles and Apparel v. U.S. Dep't of Commerce*, 413 F.3d 1344, 1347 (Fed. Cir. 2005).

The burden for seeking a preliminary injunction is lessened where, as here, the moving party seeks to preserve the status quo. *See, e.g., Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 895 (Fed. Cir. 1998) (a preliminary injunction preserves the status quo "lest one side prevent resolution of the questions or execution of any judgment by altering the status quo"). Where there are "serious issues" before the court, it is a "sound idea to maintain the status quo ante litem." *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980). This focus on the status quo makes sense as a rough-and-ready way to assess the relative harm to the parties and to avoid "unnecessary economic waste until the case is adjudicated." *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984).

## ARGUMENT

Circle Line has amply met the legal test of establishing "serious issues" that, as a legal matter, warrant preliminary injunctive relief. The balance of equities, threat of irreparable injury, and public interest weigh heavily in favor of ensuring that this solicitation is done right if it is to be done at all. The Park Service has yet to tie up too many loose ends to be permitted to move forward with the prospectus. Moreover, to the extent the Park Service has taken legal positions, its misreading of precedent has induced it to advance positions that hold out little prospect of ultimate success on the merits.

### I. The Balance Of Equities Weigh Decidedly In Favor Of Entering A Preliminary Injunction.

Failing to preserve the status quo would cause Circle Line significant, irreparable injury; entering a preliminary injunction would not harm the Park Service or any third party.

**A. Circle Line Will Suffer Irreparable Prejudice And Injury If The Court Does Not Enter A Preliminary Injunction.**

Circle Line is an "interested party" within the meaning of 28 U.S.C. § 1491(b), and a prospective bidder for the new concession contract. As the incumbent contractor for more than 50 years, Circle Line has a substantial chance of receiving the award of the new contract and faces substantial prejudice unless this Court grants the injunctive relief sought in this motion. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); *Asia Pacific*, 68 Fed. Cl. at 17. The prejudice that Circle Line faces, including the possible loss of one of the most well-known concession contracts in the Nation after more than 50 years of service, is irreparable and cannot be fully compensated through the award of monetary damages.

The Park Service's prospectus requires prospective offerors to accept "all the terms and conditions of the concession opportunity," and states that any prospective offeror that fails to "accept without condition" the terms of the prospectus "may be considered non-responsive." Prospectus, Proposal Package, at 1 (Ex. 3). Accordingly, unless it is enjoined, the prospectus will subject Circle Line to an unacceptable Hobson's choice: consent to the prospectus's unlawful terms, or forgo bidding to continue the business it has operated for more than 50 years. Only if this Court resolves Circle Line's claims *before* Circle Line is required to submit a timely proposal will Circle Line's right to redress be preserved. *See Metcalf Constr. Co. v. United States,* 53 Fed. Cl. 617, 645 (2002) (irreparable injury shown in the "form of lost opportunity to fairly compete for and perform work under the contract").

Moreover, if Circle Line is required to submit a proposal before the Court adjudicates its claims, Circle Line will be deprived of the substantial benefit it enjoys as a result of having specifically negotiated and obtained a right of preference in renewal. *See Magic Brite Janitorial v. United States*, 69 Fed. Cl. 319, 321 (2006) (incumbent contractor "by definition" faced irreparable harm because government sought to solicit new contract even though

contractor claimed that government was required to exercise an option to extend its existing contract). Because this right permits Circle Line to match the best competing offer, how Circle Line structures its proposal will inevitably depend on whether the Park Service is required to honor its contractual commitments. If its right of preference is recognized, Circle Line need only submit a responsive proposal and stand ready to match the terms of the best offer. In this fashion it can submit a strong response (as it plans to do) and then wait to see the other offers — knowing that it can exercise its right to match the best elements of the submissions of its competitors, to produce an unbeatable combination for the benefit of Circle Line and the concession as a whole.

A preliminary injunction is also warranted because if a contract award occurs before the Court adjudicates Circle Line's claims, the harms to Circle Line will be especially severe. The prospectus contemplates that, if Circle Line is not awarded the next contract, Circle Line will be required to transfer its vessels and other personal property immediately to a successor, but will not receive compensation until after a lengthy arbitration process. As a small, family-owned business, with the great majority of its assets used in connection with the concession operations, Circle Line will be out of business with no assets and no money to support the arbitration. *See Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (right to "continue a business" in which plaintiff "had engaged for thirty years" is "not measurable entirely in monetary terms"); *Associated Producers Co. v. City of Independence, Mo.*, 648 F. Supp. 1255, 1258 (W.D. Mo. 1986) ("loss of business threatening the very existence of an enterprise" may constitute irreparable injury). Equally significant, because the Park Service has not disclosed the procedures for transferring the assets, Circle Line will bear the full risk traceable to a successor's use of its property, including the risk that a successor may fail to maintain the vessels or become insolvent before Circle Line receives adequate compensation.

If the prospectus is not enjoined, Circle Line will lose of its right to a legally valid procurement, lose the opportunity to exercise its right of preference, and lose anticipated profits. In these circumstances, preliminary injunctive relief is warranted. *See Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 744 (2000) ("loss of valuable business … deriving from a lost opportunity to compete in a fair competitive bidding process" is sufficient to prove irreparable harm); *O'Donnell Contr. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992) ("damages cannot adequately compensate for" the loss of the "right to a legally valid procurement"). As courts have recognized, an abrogation of "the opportunity to compete for a contract and secure any resulting profits … constitute[s] significant harm." *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998); *Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 398 (1999); *Essex Electro Eng'rs v. United States*, 3 Cl. Ct. 277, 287 (1983), *aff'd* 757 F.2d 247 (Fed. Cir. 1985); *OAO Corp. v. United States*, 49 Fed. Cl. 478, 480 (2001); *SAI Indus. Corp. v. United States*, 60 Fed. Cl. 731, 747 (2004). Most important here, a "loss of anticipated profits" "generally" qualifies as "irreparable harm," *Minnesota Mining and Mfg. Co. v. Shultz*, 582 F. Supp. 184, 191 (D.D.C. 1984), because "it is difficult several months after the occurrence giving rise to litigation to fashion relief." *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 207 (D.C. Cir. 1984) (citation omitted). Past events often "cannot be reconstructed" and "injury complained of cannot be adequately corrected." *Id.*

### B. The Government Will Suffer No Harm If The Court Enters A Preliminary Injunction.

Although Circle Line faces irreparable harm for which there is no effective monetary remedy, entering a preliminary injunction will cause no appreciable harm to the Park Service or to any third party. This heavily lopsided balance of harms is an *independently* sufficient ground for granting preliminary injunctive relief.

It bears emphasis that Circle Line stands ready, willing, and able to continue operations under an appropriate, temporary contract extension for any period during which a preliminary injunction applies. *See* Ltr. R Gasaway to A. Conte (Apr. 11, 2007) (Ex. 52). This willingness is dispositive because courts have held that where, as here, the government may continue receiving comparable service during the pendency of an injunction, the government cannot claim that it will be harmed. *See, e.g., Advanced Sys. Tech., Inc. v. United States*, 69 Fed. Cl. 474, 486 (2006) (balance of harms favored plaintiff where the government "can continue to acquire the services uninterrupted" while merits are determined); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 52 Fed. Cl. 826, 828 (2002) (balance of harms favored plaintiff where government would continue receiving services); *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 370 (2004) (government suffered no cognizable harm where it "will receive precisely what it solicited, and what it still needs" — a contractor to service the contract).

Nor is the Park Service in any position to claim injury from delay. Given Circle Line's extensive submissions to the administrative record, the Park Service has long been on notice of Circle Line's concerns regarding the prospectus. Having decided to move forward with its prospectus notwithstanding those concerns, the agency cannot now be heard to object to Circle Line's operations continuing under current terms until the serious legal issues presented by the prospectus are resolved.

Nor is there risk of harm to third parties. Because this is a pre-award bid protest, "there are no third-party intervenors whose interest may be adversely affected by an additional delay in this procurement." *SAI Indus.*, 60 Fed. Cl. at 747. To the contrary, other prospective offerors stand to *benefit* from a preliminary injunction. Whether Circle Line's right of preference will be honored; whether the prospectus underestimates the value of Circle Line's assets; whether any successor would be required to pay for Circle Line's assets

before a transfer occurs; and whether the next concessioner will be entitled to gain Park Service approval of reasonable and appropriate fares, are critical issues that must be resolved before prospective offerors can submit meaningful, competitive offers. There is no reason for prospective offerors to go through the extended expense and inconvenience of submitting proposals on an unlawful contract that is subject to change.

## II. Circle Line Is Likely To Prevail On The Merits Of Its Claims.

At the preliminary injunction stage, the moving party is "not required to prove a mathematical (greater than fifty percent) probability of success on the merits." *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003); *Advanced Tech. Sys. Tech., Inc. v. United States*, 69 Fed. Cl. 474, 483 (2006). Accordingly, where, as here, the balance of harms weigh in favor of the moving party, a preliminary injunction should be granted as long as the movant has "a fair chance" of prevailing on the merits. *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1577 (Fed. Cir. 1990); *see also Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 513 (Fed. Cir. 1990).

The Court's review takes place in accord with "the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706." *Asia Pac. Airlines v. United States*, 68 Fed. Cl. 8, 19 n.11 (2005); *see also* 28 U.S.C. § 1491(b)(4). Section 706 requires the Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under section 706 is not an "empty gesture." *Northern States Power Co. v. FERC*, 30 F.3d 177, 180 (D.C. Cir. 1994). Although an agency is entitled to a presumption of regularity, that "presumption does not shield the agency's decision from a 'thorough, probing, in-depth review.'" *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 358 (2004) (citations omitted). A court should review the basis for an agency's decision to "determine if it was legally permissible,

reasonable, and supported by the facts." *Rotech Healthcare Inc. v. United States*, 71 Fed. Cl. 393, 401 (2006) (quoting *ViroMed Labs., Inc. v. United States*, 62 Fed. Cl. 206, 212 (2004)).

**A. Circle Line is Likely To Prevail On The Merits Of Its Claims Relating To Its Right Of Preference In Renewal.**

Circle Line deserves to prevail on its claims because the Park Service's decision not to recognize Circle Line's implied right of preference is based on a demonstrably incorrect interpretation of the D.C. Circuit's decision in *Amfac*. In addition, unrefuted record evidence establishes that the Park Service agreed, when negotiating Circle Line's existing concession contract, that Circle Line would enjoy an implied right of preference.

**1. The Park Service's Decision Not To Recognize Circle Line's Right Of Preference Lacks Any Rational Basis.**

The Park Service has not challenged any of the affidavits or documentary evidence establishing that Circle Line is entitled to an implied right of preference. The Park Service instead takes the position that, as a matter of law, Circle Line is not entitled to a right of preference because the right was not *expressly* included in Circle Line's contract. The Park Service bases its decision on the following logic: (1) under its regulations, the Park Service will not honor a concessioner's right of preference unless the "contract makes *express* reference to such a preference"; (2) the Park Service's regulations were "upheld" in the *Amfac* litigation, and therefore, (3) because Circle Line's contract "does not contain an express provision regarding a preference" in renewal, Circle Line is not entitled to that right. Answer Set No. 2, at 1-2.

It is dispositive for purposes of Circle Line's right-of-preference claim that the Park Service has misinterpreted *Amfac*. In *Amfac*, the D.C. Circuit upheld the Park Service's regulations against a *facial* attack, rejecting concessioners' across-the-board argument that *all* 1965 Act contracts — that is, each and every contract executed between 1965 and 1998 — automatically included a right of preference in renewal. *See Amfac*, 282 F.3d at 828. The

court held that the Park Service's regulations were not *facially* invalid because at least some contracts executed over that 33-year time span lacked a right of preference. Accordingly, the court found that there "are circumstances in which applying the regulation[s] would not be" unlawful. *Id.*

In reaching this conclusion, however, the D.C. Circuit emphasized that nothing in its decision would prevent an individual concessioner from proving that its own individual contract contained an implied right of preference. The court carefully explained that, notwithstanding the Park Service's regulation individual contractors may come forward with individualized evidence to prove that, when executing their 1965 Act contracts, they reached a mutual understanding with the Park Service that a right of preference would be included as an unwritten term. *Id.* at 829. In fact, the D.C. Circuit reversed the district court's grant of summary judgment, holding that individual contractors must be given an opportunity to prove that the Park Service's regulations are invalid *as applied* to individual 1965 Act contracts. *Id.* at 831.

The Park Service cannot ignore implied rights of preference or repeal them by administrative fiat. *Amfac* specifically holds that concessioners are entitled to prove that they possess implied rights of preference — a right the Park Service would deny Circle Line in this case. The Park Service's determination that Circle Line lacks a right of preference solely because it holds no *express* right of preference is arbitrary and capricious.

**2. Circle Line's Implied Right Of Preference In Renewal Must Be Honored By The Park Service**

Even apart from *Amfac*, the Park Service's decision not to recognize Circle Line's implied contractual right of preference is arbitrary, capricious, and contrary to law. The Park Service may not "exercise its power" as sovereign to alter, obstruct, or violate the contract it has entered with Circle Line. *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1575 (Fed. Cir. 1997); *Temple-Inland, Inc. v. United States*, 59 Fed. Cl. 550 (2004) (government

may not induce private parties to contract and then renege on its implied promises). Because all contracts, including government contracts, "contain an implied covenant of good faith and fair dealing," the government may not deprive Circle Line of the benefits of its bargain. *Centex Corp. v. United States*, 49 Fed. Cl. 691, 708 (2001).

In determining whether a contract contains an implied term, courts examine, among other things, past and continuing conduct; the circumstances surrounding the contract; and official statements made by authorized representatives during the contract-formation process. Terms will be implied if they were "clearly in the contemplation of the parties" at the time they negotiated the contract. *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 461 (5th Cir. 2003); *see also 511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 729 N.Y.S.2d 34, 36 (N.Y. App. Div. 2001) (implied promise to sell within a reasonable time); *Midwest Mobile Diagnostic Imaging v. Dyanamics Corp. of Am.*, 965 F. Supp. 1003, 1014 (W.D. Mich. 1997) (implied promise that mobile trailer's interior would be "aesthetically pleasing"); *Ryder Truck Rental, Inc. v. Cent. Packing Co.*, 341 F.2d 321, 323 (10th Cir. 1965). As the Supreme Court has long recognized, "a contract includes, not only the promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made." *Sacramento Navigation Co. v. Salz*, 273 U.S. 326, 329 (1927); *Hercules, Inc. v. United States*, 516 U.S. 417, 424 (1996).

Courts also have repeatedly held that government contracts may include implied terms. *See, e.g.*, *California Fed. Bank v. United States*, 245 F.3d 1342 (Fed. Cir. 2001); *Alvin Ltd. v. United States Postal Serv.*, 816 F.2d 1562 (Fed. Cir. 1987); *Macke Co. v. United States*, 467 F.2d 1323 (Ct. Cl. 1972). In considering whether a government contract contains an implied promise, the agency's contemporaneous construction is entitled to "substantial weight." *National Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 182 (D.C. Cir. 1982);

*Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982). Statements and actions by contracting parties "before the advent of controversy" are "often more revealing than the dry language of the written agreement by itself." *Alvin Ltd. v. U.S. Postal Serv.*, 816 F.2d 1562, 1566 (Fed. Cir. 1987). If pre-contract statements could be ignored, then "meetings between government procurement officers and prospective bidders" would "become a sham" because "[q]uestions would be useless, for answers would be without force, and the amounts of bids received would soon show the results." *Sylvania Elec. Prods., Inc. v. United States*, 458 F.2d 994, 1008 (Ct. Cl. 1972).

It is therefore dispositive that the Park Service and Circle Line mutually agreed that Circle Line would be entitled to a contractual right of preference in renewal. As explained above, the Park Service granted Circle Line this bargained-for right in return for Circle Line's agreement to expand its concessions operations, build new vessels, forgo compensation owed to it by the Park Service, and shorten its existing contract. *All* of the principal participants in the relevant negotiations — Circle Line's President, Circle Line's counsel, and the relevant Park Service Regional Director — agree on these points. *See* Moran Aff. ¶ 3, 5; Hartzog Aff. ¶¶ 2, 5; Cables Aff ¶¶ 2, 5. Where, as here, government officials make oral promises to induce companies to enter government contracts, courts do not hesitate to enforce those promises. As the Court of Claims recognized long ago, refusing to enforce implied promises "would be like authorizing government employees to set a trap to lure the unwary into signing a contract." *George H. Whike Constr. Co. v. United States*, 140 F. Supp. 560, 564 (Ct. Cl. 1956).

**B. Circle Line Is Likely To Prevail On The Merits Of Its Claims Concerning The Transfer Of Circle Line's Assets To A New Concessioner.**

Circle Line is also likely to prevail on the merits because the Park Service's solicitation arbitrarily and capriciously fails to disclose accurate information concerning the transfer of assets to a successor in the event Circle Line is not awarded the contract.

### 1. The Park Service's Gross Undervaluation Of Circle Line's Assets Improperly Interferes With Full And Open Competition.

The Park Service's prospectus grossly understates the value of Circle Line's seven vessels at $18,732,000. As noted above, in 2002, long before the recent significant increases in boat building prices, Park Service officials internally estimated that Circle Line's vessels were worth between $25 and $30 million. *See* Email J. Swofford to M. Rust, et al. (Feb. 27, 2002). More recently, Circle Line has obtained a letter from Blount Boats, Inc., the company that built six of the vessels, indicating that it would cost approximately $44 million — in a range of $41.75 million to $46.5 million — to replace Circle Line's seven vessels.

Against this backdrop the Park Service has offered no evidence to support its $18 million estimate. The Park Service downplays its value estimate, insisting that each prospective offeror is responsible for making its own estimate of the compensation owed to Circle Line. *See* Answer Set No. 2, at 18. But the Park Service also recognizes, as it must, that prospective offerors have no right to inspect Circle Line's vessels. *See* Answer Set No. 4, at 9. The point is that prospective offerors need to be able to evaluate the reasonableness of the Park Service's estimate if there is to be full, fair, and open competition. But no such assessments are possible because the Park Service has refused to release the basis for its value estimates. *See* Answer Set No. 2, at 18; *see Asia Pacific*, 68 Fed. Cl. at 24 (arbitrary for the government to disqualify a contractor from any award "based upon an interpretation" that it "refused to discuss with, or to clarify for," the contractor). The Park Service also admits that, in estimating the value of Circle Line's assets, it has not conducted a proper appraisal and has failed to submit its analysis to the Department of Interior's Office of Appraisal Services. *See* Answer Set No. 2, at 18.

It is no answer for the Park Service to argue that Circle Line's estimate is speculative or that the Park Service's artificially deflated estimate serves the larger interest of competition. This Court recently rejected similar arguments in *Arch Chemicals, Inc. v.*

*United States*, 64 Fed. Cl. 380 (2005). There, under the terms of the contractor's expiring contract, the government was required to pay a lump sum of $8,513,000 in "plant shutdown related costs" if the new contract were awarded to another offeror. *Id.* at 400. The incumbent sued when the government failed to include these costs in its solicitation. The government argued that the plant shutdown costs were "too speculative" and that including them would "discourage competition." *Id.* at 399, 400. The Court deemed these arguments "without merit," *id.* at 399, pointing out the obvious — that it was altogether "irrational to close one's eyes to these shutdown costs." *Id.* at 400. Even were it appropriate to encourage "competition" by blindfolding bidders to the contract's true costs, doing so would not serve the government's underlying interest in competition. Rather, discouraging bidders wary of likely additional costs, while encouraging those bidders able to absorb them, *serves* competition and efficient bidding. *See id.* at 400-01. The Court accordingly enjoined the solicitation, consistent with its cases addressing similarly deficient solicitations. *See Overstreet*, 47 Fed. Cl. at 742, 745 (declining to "rubber stamp" solicitation that failed to include necessary costs).

**2. The Park Service's Prospectus Is Invalid Because The Park Service Has Arbitrarily Failed To Respond To Concerns Raised By Circle Line.**

The Park Service's prospectus also should be enjoined because the Park Service has failed to clarify the procedures by which Circle Line's assets will be transferred to a possible successor in the event Circle Line is not awarded the next contract.

Circle Line submitted an extensive analysis to the Park Service explaining why the Park Service could not authorize transfer of Circle Line's property on the timetable or in the manner contemplated in the prospectus. *See* Takings Clause Analysis (Jan. 2, 2006) (Ex. 20). As Circle Line explained, the prospectus is unlawful because it seeks to transfer Circle Line's assets (including its seven vessels) to a successor before Circle Line receives full payment for

its property. *See id.* at 5-7. Rather than substantively answer this serious objection, the Park Service responded only that "[n]egotiations between [Circle Line] and any succeeding Concessioner will be completed pursuant to the Existing Contract" and that Circle Line's "legal analyses do not reflect the position of the NPS." Answer Set No. 2, at 20.

It is a bedrock principle of administrative law that, even in informal adjudications, a government agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *New York State Bar Ass'n v. FTC*, 276 F. Supp. 2d 110, 116 (D.D.C. 2003). Agency decisions must be "based on a consideration of the relevant factors" and may not fail "to consider an important aspect of the problem" or offer "an explanation for its decision that runs counter to the evidence" before it. *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *Zotos Int'l., Inc. v. Young*, 830 F.2d 350, 352 (D.C. Cir. 1987) (scrutiny of informal adjudications to be "searching and careful") (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Where an agency "has failed to articulate any explanation, let alone a satisfactory one, for its interpretation" the agency decision is inherently arbitrary and capricious. *New York State Bar Ass'n*, 276 F. Supp. 2d at 140-41.

Here, the Park Service has failed to respond in any meaningful manner to the serious objections raised by Circle Line. *See PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (an "agency's 'failure to respond meaningfully' to objections raised by a party renders its decision arbitrary and capricious"); *Public Serv. Comm'n v. FERC*, 397 F.3d 1004, 1008 (D.C. Cir. 2005)). The Park Service's failure to provide a "coherent and reasonable explanation" for its decision is the hallmark of arbitrary and capricious agency action. *Che Consulting, Inc. v. United States*, 74 Fed. Cl. 742, 746 (2006) (citing *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001)).

### 3. The Park Service's Solicitation Is Unlawful Because It Impermissibly Fails To Make Clear The Requirements For Transferring Circle Line's Assets.

Finally, the Park Service's failure to respond to Circle Line's objections is underscored by the fact that its position is substantively unsupportable. The prospectus impermissibly impedes "full and open competition" because it fails to disclose that any successor concessioner must pay for Circle Line's assets in full before being entitled to take the assets for their own use and operation. *Custom Printing Co. v. United States*, 51 Fed. Cl. 729, 735 (2002).

Government agencies are required to comply with the Constitution, including the Takings Clause, which provides that private property shall not "be taken for public use without just compensation." U.S. CONST., amend. V. Moreover, where, as here, the government seeks to authorize a *private* party to assume ownership of property pursuant to the governmental power of eminent domain power, special assurances of adequate security must be provided before a transfer of title or even a right to enter, possess, or use the property takes effect. *See, e.g., East Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004).

Most importantly, property owners have a substantial interest in not being subjected to the insolvency risk traceable to a private party's assumption of the right to use property pending the final provision of constitutionally adequate compensations. *See, e.g.*, Jim Behnke & Harold Dondis, *The Sage Approach to Immediate Entry by Private Entities Exercising Federal Eminent Domain Authority Under the Natural Gas Act and the Federal Power Act*, 27 Energy L.J. 499, 523-24 (2006). Courts have thus held that an immediate transfer of property to a private party may not occur absent an *express* source of statutory authority. *See, e.g., Northern Border Pipeline Co. v. 86.72 Acres of Land*, 144 F.3d 469 (7th Cir. 1998) (there must be a specific source of statutory authority to allow private parties to take immediate title to property they seek to condemn); *United States v. Parcel of Land with*

*Improvements Thereon in Square South of 12, Dist. of Columbia*, 100 F. Supp. 498 (D.D.C. 1951) (a private party may not be delegated immediate power to take property unless such power is conferred specifically by statute).

It is therefore significant that the Park Service's statutory authority to take the property of its concessioners is limited. With respect to post-1998 Act contracts, the Park Service has no authority to take moveable assets and transfer them to a new concessioner. *See* 16 U.S.C. § 5954(a). To the extent Circle Line's movable assets are subject to the 1998 Act, the Park Service lacks authority unilaterally to order a transfer of assets. *See, e.g., Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("an agency literally has no power to act … unless and until Congress confers power upon it"); *United States v. Goltra*, 312 U.S. 203, 208-09 & n.10 (1941) (a taking by government agents without legislative authorization is a tortious act, not an exercise of eminent domain power).

To be sure, as noted above, the 1998 Act includes a savings provision, providing that it does not "affect the validity of any concessions contract or permit entered into" under the 1965 Concessions Policy Act. But the 1989 contract does not give the Park Service any authority to order a forced transfer of Circle Line's assets *before* payment of just compensation. Nor is there any contractual or statutory provision even purporting to permit the Park Service to delegate the obligation to provide just compensation to a succeeding concessioner. *Cf. Ohio Bell Tel. Co. v. Public Util. Comm'n*, 301 U.S. 292, 307 (1937) (waivers of constitutional rights must be clear and unmistakable); *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937) (same); *D.H. Overmeyer Co. v. Frick Co.*, 405 U.S. 174, 188 (1972) (Douglas, J., concurring) (same). Moreover, under the doctrine of *contra proferentum*, any such provisions, even if they did exist, would have to be construed against the Park Service, the party who drafted the contract. *See Interstate Gen. Gov't Contractors, Inc. v. Stone*, 980 F.2d 1433, 1435 (Fed. Cir. 1992); *Peter Kiewit Sons' Co. v. United States*,

109 Ct. Cl. 390 (1947) (the doctrine of *contra proferentum* is "especially applicable to Government contracts where the contractor has nothing to say as to its provisions").

Because the Park Service's statutory authority to take property is limited, and because the Park Service lacks authority to relieve a successor concessioner from its obligation to pay just compensation in advance of assuming title, possession, or use of Circle Line's property, the Park Service lacks authority to order such a transfer.

**C. The Park Service's Mandatory Decrease In Inflation-Adjusted Passenger Fares Violates The Statutory Requirements And Constitutes An Unexplained Departure From Precedent.**

Circle Line is also likely to prevail on the merits of its claim that the Park Service's prospectus mandates an unlawful decrease in real fares.

**1. The Park Service's Rate Freeze Violates The 1998 Act Because It Invades The Concessioner's Right To Set Reasonable And Appropriate Rates.**

The 1998 Act mandates that "[e]ach concessions contract *shall* permit the concessioner to set reasonable and appropriate rates and charges for ... services provided to the public," subject to approval by the Park Service. 16 U.S.C. § 5955(a) (emphasis added). The Act further states that the Park Service's approval process "shall be as prompt and as unburdensome to the concessioner as possible." *Id.* § 5955(b). It makes clear, that "[u]nless otherwise provided in the contract, the reasonableness and appropriateness of rates and charges shall be determined primarily by comparison with those rates and charges for ... services of comparable character." *Id.*

The rate-setting method required by the prospectus violates these statutory requirements. Rather than permitting the concessioner to set reasonable and appropriate rates, as Congress mandated, the prospectus seeks to freeze fares for three years (until 2011) at a fixed, below-market rate as a pre-condition for submitting an offer on the new contract. In seeking to fix rates *sua sponte*, the Park Service's prospectus unlawfully invades the

concessioner's rights under the 1998 Act, and exceeds the Park Service's statutory authority. *See, e.g.*, *Holly Sugar Corp. v. Johanns*, 437 F.3d 1210, 1213 (D.C. Cir. 2006) (agencies must pay close attention to their statutory mandate, which can grant them rate making authority in some areas, while denying it in others). Moreover, in reducing, without explanation, the fares the concessioner is permitted to charge for the ferry and "Island Cruise" services called for under the new contract, the Park Service has violated the statutory requirement that the Park Service must rely to the "maximum extent practicable" on "market forces." *See, e.g.*, *Columbia Gas Transmission Corp. v. FERC*, 628 F.2d 578, 587 (D.C. Cir. 1979).

Significantly, Park Service consultants told Circle Line's President in 2005 that a fare of at least $15 for ferry service could be justified based on a comparison of rates to other excursion services in New York that the Park Service had performed. *See* Ltr. R. Gasaway to C. Garrett (Mar. 15, 2007). That determination is supported by Circle Line's submissions showing that the proposed $12 rate for adult fares is well below market rates. *See* Passenger Fare Analysis, at 7 (noting that comparable services in New York harbor charge fares of $20, and that concession ferry services to Alcatraz Island charge $21.75 for an adult early bird fare). Indeed, by 2011, with even modest inflation, the already yawning gap between the prospectus's mandated fares and those of comparable services in New York harbor will grow even larger.

In its response to questions and analysis submitted by Circle Line, the Park Service asserts that it may freeze fares at below market rates because it has "determined that the Draft Contract, as a whole, will provide the Concessioner a reasonable opportunity for net profit in relation to capital invested and the obligations of the Draft Contract." Answer Set No. 3, at 9, 13. But how much money will or will not flow through the concession's bottom line is not the relevant question. Rather, the issue is whether the Park Service's proposal starves the

concession of top-line revenue, quite apart from the concessioner's ability to earn a profit at the end of the day. After all, a bare-bones and revenue-starved concession could nonetheless be profitable.

The Park Service also asserts that it has authority to "establish rates and charges" because section 406(a) of the 1998 Act states that rates shall be evaluated through a comparability analysis, "unless otherwise provided in the contract ...." *Id.* at 13. But there is nothing in the statute that supports the Park Service's reading of this provision. *See, e.g.*, *Prill v. NLRB*, 755 F.2d 941, 947-48 (D.C. Cir. 1985) (an agency's order "may not stand if the agency has misconceived the law") (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). Whereas section 406(b) permits the Park Service *and* the concessioner to agree to a specific methodology for determining the "reasonableness and appropriateness" of the rates set by the concessioner, there is nothing in the ratemaking method set out in the prospectus that can be said to involve a concessioner's voluntary agreement. Instead of permitting prospective concessioners to negotiate regarding various methodologies, the prospectus *requires* prospective concessioners to take or leave the method the prospectus specifies.

In sum, the prospectus is unlawful precisely because it imposes mandates where the law requires openness to proposals. Agencies granted the power to reach certain results by agreement may *not* effectively compel private parties to "agree" to whatever terms the agency desires. *See, e.g., National Treasury Employees Union v. Chertoff*, 452 F.3d 839, 857 (D.C. Cir. 2006) (overturning agency rule that permitted the abrogation of agreements as contrary to the Federal Services Labor Management Statute's mandate for the agency to bargain).

### 2. The Park Service's Rate Freeze Is Arbitrary And Capricious Because The Park Service Has Not Adequately Explained Its Departure From Precedent.

Even if the prospectus did not violate the plain, mandatory terms of the 1998 Act (which it does), it would still be unlawful because the Park Service has not explained its departure from prior practices or disclosed the basis for its decision. *See Ceres Envtl Servs., Inc. v. United States*, 52 Fed. Cl. 23, 34 (2002) (granting pre-award bid protest in part because agency "failed to explain its departure from its own previous decisions").

The Park Service's standard contract and policy documents make clear that the Park Service is supposed to "review and approve concessioner rates" through an "analytical process" that produces "defendable results" and reflects "the competitive marketplace." NPS Rate Approval Guide, at 6 (Ex. 5). The Park Service has recognized six methods available "to determine appropriate rates," *id.* at 5, none of which have been used in connection with this prospectus. To be sure, the Park Service's policy manuals do contemplate that where, unlike here, comparables are not readily available, the parties might agree to a "contract specific rate." But, more importantly, the manuals make clear that the rate should be annually adjusted to account for changes in inflation. None of the recognized methods permit the Park Service to freeze nominal rates so as to guarantee that, taking inflation into account, real rates steadily decrease over time. *Cf. Charles H. Tompkins Co. v. United States*, 43 Fed. Cl. 716, 723 (1999) (solicitation enjoined where "agency's specifications have been overstated and are deemed to be overly restrictive").

Equally significantly, the Park Service has offered no explanation why freezing rates is reasonable and justified by an analysis of rates for comparable services. The only conceivable way the prospectus's rate freeze might begin to comply with statutory requirements is if the Park Service were to justify the rates as comparable to market-based rates and establish that no price inflation at all is likely to occur over the next three years.

Although the Park Service has confirmed that it has performed "internal" analyses "regarding expected inflation during the terms of the Draft Contract," Answer Set No. 3, at 13, it has inexplicably refused to disclose those analyses.

**III. A Preliminary Injunction Is In The Public Interest.**

The most compelling and clear-cut of all of the four factors is, finally, the public interest. There "is an overriding public interest in preserving the integrity of the procurement process," *Advanced Systems*, 69 Fed. Cl. at 486 (citing *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997)); specifically, in "ensuring that the government procurement process is fair." *Doty v. United States*, 53 F.3d 1244, 1251 (Fed. Cir. 1995).

In the context of agency solicitations for government contracts, the requirement of fairness and integrity means, above all, competition based on common knowledge and full disclosure of relevant, material, contract requirements. It is "axiomatic" that "there can be no effective competition on a common basis, and that there can be no intelligent bidding for a contract, unless all offerors know what the contract requirements will be." *Alanthus Data Commc'ns. Corp.*, B-206946, 1983 WL 26452, at *5 (Comp. Gen. Feb. 10, 1983). Contracting agencies must avoid ambiguities in requirements that would "imped[e] full and open competition." *Custom Printing Co. v. United States*, 51 Fed. Cl. 729, 735 (2002) (citing *Caldwell & Santmyer v. Glickman*, 55 F.3d 1578, 1580 (Fed. Cir. 1995)).

A long line of cases accordingly holds that where, as here, a solicitation's terms are false, misleading, or incomplete, "cancellation of the solicitation is appropriate." *Charles H. Tompkins Co. v. United States*, 43 Fed. Cl. 716, 723 (1999); *Aviation Enters., Inc. v. United States*, 8 Cl. Ct. 1, 19 (1985). Misleading or ambiguous contractual provisions do "not further competition." Rather, they present "a compelling reason to cancel all bids" and to start anew. *International Ass'n of Firefighters v. U.S. Dep't of Navy*, 536 F. Supp. 1254,

1269 (D.R.I. 1982); *Mark Dunning Industries v. Perry*, 890 F. Supp. 1504, 1515 (M.D. Ala. 1995); *A.G. Schoonmaker Co. v. Resor*, 445 F.2d 726, 728 (D.C. Cir. 1971).

Here, the Park Service has not seriously addressed the legal issues presented by the Statue of Liberty solicitation. For whatever reason, it has declined every one of Circle Line's many invitations to meet and confer in good faith to resolve those issues. Nonetheless, the Park Service has avoided any risk of service disruptions thanks to Circle Line's unparalleled reliability and willingness to continue serving the public. *See* Ltr. R Gasaway to A. Conte (Apr. 11, 2007) (Ex. 52). Because Circle Line is fully prepared to continue service on a temporary basis under the terms of its existing contract, and because Circle Line "has been performing under the contract without incident," Circle Line can continue to provide service without harming the public interest — at least until final relief "can be fashioned." *Dynalectron Corp. v. United States*, 659 F. Supp. 64, 70 (D.D.C. 1987).

**CONCLUSION**

This Court should enjoin the Park Service from proceeding with its solicitation for the next concessions contract at Statue of Liberty National Monument and Ellis Island until the legal infirmities identified above are cured.

Respectfully submitted,

Robert R. Gasaway
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Attorney for plaintiff*
*Circle Line–Statue of Liberty Ferry, Inc.*

April 16, 2007

**ADDITIONAL COUNSEL:**

OF COUNSEL:

Raymond G. McGuire
KAUFF MCCLAIN & MCGUIRE LLP
950 Third Avenue, 14th Floor
New York, N.Y. 10022
Telephone: (212) 644-1010
Facsimile: (212) 644-1936

OF COUNSEL:

Edward J. Boyle
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
150 East 42nd Street
New York, N.Y. 10017
Telephone: (212) 490-3000
Facsimile: (212) 490-3038

OF COUNSEL:

Robert R. Ryland
Jeffrey B. Clark
Ashley C. Parrish
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Attorneys for Circle Line–Statue of Liberty Ferry, Inc.*

April 16, 2007

**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**

BID PROTEST

| | | |
|---|---|---|
| CIRCLE LINE – STATUE OF LIBERTY FERRY, INC., | ) | Case No. 07-237 C |
| Plaintiff, | ) | |
| v. | ) | Judge ____________ |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**[PROPOSED] ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

The Court, having considered the plaintiff Circle Line–Statue of Liberty Ferry, Inc.'s Motion for Preliminary Injunction and the defendant's Opposition, hereby ORDERS that defendant shall not award any contract under solicitation number STLI1001-07, and STAYS the deadline for submitting proposals for solicitation number STLI1001-07 until further Order of this Court.

It is so ORDERED.

______________________
Judge,
U.S. Court of Federal Claims

Entered this ____ day of _________, 2007.

ORIGINAL

FILED
APR 16 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

| | |
|---|---|
| CIRCLE LINE – STATUE OF LIBERTY FERRY, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 07-237 C<br><br>Judge ____________ |

## CERTIFICATE OF SERVICE

I certify that I have caused a true and accurate copy of the following documents:

1. Verified Complaint
2. Appendix of Exhibits
3. Application for Temporary Restraining Order and Motion for Preliminary Injunction; Memorandum in Support; and Proposed Orders
4. Motion For Entry Of A Temporary Protective Order, For Leave To File Electronic Documents Under Seal, And For Leave To File Circle Line's Appendix Of Exhibits Under Seal; and Proposed Order

to be delivered by hand to:

Gregg M. Schwind
Trial Attorney
United States Department of Justice
Civil Division, Commercial Litigation Branch
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530 [Overnight zip code: 20005]

Respectfully submitted,

Robert R. Gasaway
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Attorney for plaintiff*
*Circle Line–Statue of Liberty Ferry, Inc.*

Date: April 16, 2007