# In the United States Court of Federal Claims

No. 07-237C
Filed: May 14, 2007

| | | |
|---|---|---|
| CIRCLE LINE—STATUE OF LIBERTY FERRY, INC., Plaintiff, v. THE UNITED STATES, Defendant. | ) | Pre-Award Bid Protest: A motion for a preliminary injunction and a temporary restraining order will not be granted where (1) plaintiff has little likelihood of success on the merits since the evidence does not support a finding that plaintiff possesses an implied right of preference in contract renewal; and (2) plaintiff cannot demonstrate irreparable harm when it has available to it a contract remedy. |

Robert R. Gasaway, Kirkland & Ellis LLP, Washington, DC, counsel for plaintiff. Robert S. Ryland, Jeffrey B. Clark, and Ashley C. Parrish, Kirkland & Ellis LLP; Raymond G. McGuire, Kauff McClain & McGuire LLP; and Edward J. Boyle, Wilson Elser Moskowitz Edelman & Dicker LLP, of counsel.

Gregg M. Schwind, with whom were Assistant Attorney General Peter D. Keisler, Director Jeanne E. Davidson, and Deputy Director Bryant G. Snee, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, counsel for defendant. Anthony R. Conte and Pamela Barkin, U.S. Department of the Interior, of counsel.

OPINION

WIESE, Judge.

Plaintiff, Circle Line–Statue of Liberty Ferry, Inc., sues here for declaratory and injunctive relief, seeking to enjoin the Department of Interior's National Park Service ("Park Service") from soliciting a concessions contract for ferry service to the Statue of Liberty National Monument and Ellis Island. Specifically, plaintiff asks the court to declare arbitrary, capricious, unlawful, and without rational basis the Park Services's failure to (1) recognize plaintiff's preexisting implied right of preference in contract renewal, which plaintiff allegedly negotiated with the Park Service in 1989 when executing its current contract; (2) include in its prospectus the basis for its estimation of the value of plaintiff's assets that would be transferred to

a successor concessioner should plaintiff not receive the awarded contract; (3) identify the process by which those assets would be transferred; and (4) allow the awardee to exercise its statutory right to set reasonable and appropriate fare rates.

The court heard oral argument on these matters on April 26, 2007. For the reasons announced by the court at the close of the argument and as further explained below, plaintiff's motion for a temporary restraining order and preliminary injunction is denied.

## BACKGROUND

Congress first created the National Park Service in 1916, authorizing the Secretary of the Interior to "grant privileges, leases, and permits for the use of land for the accommodation of visitors in the various parks, monuments, or other reservations" under the Secretary's authority. Act of Aug. 25, 1916, ch. 408, Pub. L. No. 64-235, § 3, 39 Stat. 535 (1916). From its inception, the Park Service offered financial incentives in order to attract concessioners to provide services in remote National Park locations and to make substantial capital investments on those lands. See S. Rep. No. 89-765, at 7 (1965), reprinted in 1965 U.S.C.C.A.N. 3489, 3495. Chief among these incentives was a preferential right of renewal, allowing an incumbent concessioner to renew its contract by matching the best offer of any competing bidder so long as it had performed its present contract satisfactorily. See Memorandum for the Acting Under Secretary, U.S. Department of the Interior (Aug. 10, 1940).

For almost fifty years, the Park Service recognized the preferential right of renewal as a matter of Park Service policy, although it did not generally write such a term within its concessions contracts. In 1965, however, Congress enacted the National Park Service Concession Policies Act ("the 1965 Act"), Pub. L. No. 89-249, 79 Stat. 969 (1965), in order to "put into statutory form policies which, with certain exceptions, have heretofore been followed by the National Park Service in administering concessions." S. Rep. No. 89-765, at 1 (1965), reprinted in 1965 U.S.C.C.A.N. 3489, 3489. With respect to renewal preferences, the 1965 Act provided:

> The Secretary shall encourage continuity of operation and facilities and services by giving preference in the renewal of contracts or permits and in the negotiation of new contracts or permits to the concessioners who have performed their obligations under prior contracts or permits to the satisfaction of the Secretary.

Pub. L. No. 89-249, § 5, 79 Stat. 970 (1965).

In November 1998, Congress revisited the issue of renewal preferences in the National Park Service Concessions Management Improvement Act of 1998 ("the 1998 Act"), 16 U.S.C. §§ 5951–6011 (2000). Having found that "[t]rue competition simply did not exist" in the award of concession contracts, 65 Fed. Reg. 20,630 (Apr. 17, 2000), Congress reversed the renewal preference policy set out in the 1965 Act by directing that "the Secretary shall not grant a concessioner a preferential right to renew a concessions contract, or any other form of preference to a concessions contract." 16 U.S.C. § 5952(7). Included in the 1998 Act, however, was a "savings" provision, which provided that the Act "shall not affect the validity of any concessions contract or permit entered into under [the 1965] Act" and shall not apply to existing contracts "to the extent [the 1998 Act's] provisions are inconsistent with the terms and conditions of any such contract or permit." Pub. L. No. 105-391, § 415, 112 Stat. 3515 (1998).

Plaintiff, the provider of ferry service to the Statue of Liberty and Ellis Island for the entirety of the concession's more than 50-year existence, is currently operating under a 15-year concessions contract entered into in 1989.[1] On December 28, 2006, the Park Service issued a prospectus anticipating the award of a ten-year follow-on contract for ferry service, seeking bids no later than 4:00 p.m. on April 27, 2007. After unsuccessfully seeking a determination from the Park Service that plaintiff possessed a preferential right of renewal under its existing contract,[2] plaintiff filed suit in this court on April 16, 2007, seeking injunctive relief.

DISCUSSION

In determining whether to grant a preliminary injunction, courts traditionally consider four factors: whether plaintiff is likely to succeed on the merits of its claim; whether plaintiff will suffer irreparable harm if the court withholds injunctive relief; whether the balance of hardships favors the granting of injunctive relief; and whether the public interest would be served by granting injunctive relief. FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993). Because we conclude that the first two factors—plaintiff's likelihood of success on the merits and the extent to which it will suffer irreparable harm in the absence of injunctive relief—weigh

---

[1] Plaintiffs' contract was later extended by mutual agreement in late 2003 (to March 31, 2007) and again in early 2007 (to October 1, 2007).

[2] Defendant initially argued that plaintiff's suit was premature because plaintiff had failed to exhaust its administrative remedies as set forth in 36 C.F.R. § 51.47(d). We understand defendant's exhaustion argument, however, to have arisen from a misunderstanding between the parties regarding the applicability of that regulation and to have been resolved by counsel at oral argument.

overwhelmingly in defendant's favor, however, we do not reach the final two considerations. See Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc., 908 F.2d 951, 953 (Fed. Cir. 1990) (observing that while "no one factor, taken individually, is necessarily dispositive," the "absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial" of an injunction).

I.

Likelihood of Success on the Merits

A. Implied Right of Preference in Contract Renewal

Although plaintiff concedes that the 1998 Act generally repealed the provisions of the 1965 Act, it maintains that the savings provision of the 1998 Act protects both express and implied contract rights formed under the 1965 Act and thus shelters plaintiff's implied right of renewal from legislative change. In support of this assertion, plaintiff notes that an earlier version of the savings provision proposed by the Senate provided that the 1998 Act would apply to all existing concessions contracts "except to the extent such provisions are inconsistent with the express terms and conditions" of those contracts. S. Rep. No. 105-202, at 11 (1998) (emphasis added). Plaintiff interprets the omission of the word "express" from the final version of the statute as evidence that Congress intended both express and implied terms to be exempt from the 1998 Act's reach. Plaintiff thus claims that the Park Service's refusal to honor its right of renewal is a statutory violation and is thus enjoinable.[3]

---

[3] In its March 7, 2007, response to questions submitted by prospective offerors regarding the right of renewal, the Park Service advised:

> [National Park Service] regulations at 36 C.F.R. § 51.102 . . . discuss the issue of preference in the renewal of concession contracts, noting that the Concessions Policy Act of 1965 . . . provided such a statutory right, and that the National Park Service Concessions Management Improvement Act of 1998 . . . repealed this statutory provision. In accordance with the 1998 Act, [National Park Service] regulations provide that "It is the final decision of the Director . . . that holders of the 1965 Act concession contracts are not entitled to be given a renewal preference with respect to such contracts . . . " unless the 1965 Act concession contract makes express reference to such a preference. . . . Because the Existing Concession Contract does not

(continued...)

Plaintiff's argument turns, then, on whether the court is willing to construe the right of renewal as an implied term of plaintiff's 1989 contract. In plaintiff's view, a contract term is implied if it was "clearly in the contemplation of the parties" at the time they negotiated the contract, even if the parties "deemed it unnecessary" to place the term in the contract itself. Leasehold Expense Recovery, Inc. v. Mothers Work, Inc., 331 F.3d 452, 461 (5th Cir. 2003). The agency's contemporaneous understanding of contract negotiations, plaintiff's argument continues, is to be given "substantial weight" because the agency was in a better position at the time to decide how to characterize Congress's intent. National Wildlife Fed'n v. Gorsuch, 693 F.2d 156, 182 (D.C. Cir. 1982). Plaintiff thus refers us to the affidavits of the principal participants in the 1989 contract negotiations—Circle Line's President, Circle Line's outside counsel, and the relevant Park Service Regional Director—all of whom, plaintiff contends, agree that the Park Service granted plaintiff a bargained-for contractual right of preference in renewal in exchange for valuable consideration.[4]

---

[3](...continued)

> contain an express provision regarding a preference in the renewal of the Contract, the Director has determined that no Preferred Offeror for the new concession contract exists in accordance with 36 C.F.R. § 51.102.

[4] Circle Line's then-president Joseph A. Moran, for instance, testified that "[i]n part because the Park Service assured Circle Line that the right of preference would be protected under Circle Line's contract, Circle Line agreed to build two new vessels, gave up three years on its previous 1982 contract, and did not pursue litigation against the Park Service for damages arising out of a forced suspension of concession operations that occurred while major renovations were being made to the Statue of Liberty and Ellis Island." Mr. Moran went on to explain that:

> [Circle Line was] told by the Park Service Solicitor's Office that putting the right of preference language in the contract as an express term was unnecessary because the contract already guaranteed Circle Line that right. According to the Solicitor's office, because both sides understood that Circle Line would be entitled to the right of preference in renewal, there was no basis for modifying the language of the Park Service's standard form contract to expressly mention the existence of the right of preference.

George B. Hartzog, Jr., the outside counsel who negotiated the contract on plaintiff's behalf, similarly testified in a 2006 affidavit that "the Park Service, acting through Regional Director Herbert Cables, and Circle Line reached a mutual understanding that Circle Line would enjoy an implied right of preference under the

(continued...)

Plaintiff additionally cites numerous documents in support of its assertion that its renewal preference reflected the mutual understanding of the parties and should thus be construed as an implied contractual term. Plaintiff notes, for example, that the Park Service published a notice in the Federal Register on June 21, 1988, which stated that the concessioner under the new contract would enjoy a right of preference in renewal. 53 Fed. Reg. 23,315 (June 21, 1988). Similarly, plaintiff points to a June 24, 1988, letter in which the Park Service notified plaintiff of its intent to negotiate a new concessions contract and supplied a Fact Sheet prepared by the Park Service stating "the requirements and conditions under which it propose[d] to continue the operation." The Fact Sheet specified that "[c]oncessioners who have provided satisfactory service during the lifetime of their concession contracts enjoy, pursuant to the Act of October 9, 1965 . . . , a preference in the renewal of their contracts." The Park Service additionally attached a copy of the 1965 Act to the Fact Sheet.

Plaintiff reads these documents and the accompanying affidavits as incorporating the terms of the 1965 Act into its 1989 concessions contract. The court, however, does not agree. In virtually every instance, the evidence plaintiff offers refers to plaintiff's preference renewal entitlement as existing pursuant to the 1965 Act. Such references do nothing more than confirm the then-existing statutory direction that the Secretary shall give "preference in the renewal of contracts . . . to the concessioners who have [satisfactorily] performed their obligations"; they do not create a contractual right that insulates plaintiff from a change in law.[5]

---

[4](...continued)
1989 Contract as part of the consideration for Circle Line's agreement to give up three years on its existing contract and to resolve claims arising out of the closure of the Statue of Liberty and Ellis Island."

Finally, Herbert S. Cables, Jr., the Park Service's Regional Director for the North Atlantic Region and the individual primarily responsible for negotiating plaintiff's 1989 contract, testified in a 2006 affidavit that "the Park Service agreed that the right of preference in renewal would be part of the consideration that Circle Line would receive in return for its agreement to give up three years on its existing 1982 contract as part of the resolution of issues relating to the closure of the Statue of Liberty in the mid-1980s."

[5] There is ample evidence in the record that Park Service officials similarly based their interpretation of the renewal rights of concessioners on the 1965 statute. In a November 11, 2002, letter, for instance, the Park Service advised plaintiff's outside counsel as follows:

(continued...)

Even though the Park Service, according to its Regional Director, Herbert S. Cables, Jr., understood that "it was the mutual understanding of both the Park Service and Circle Line that Circle Line would be entitled to an implied right of preference in renewal under its 1989 contract," it is telling that there is a complete absence of a contemporaneous written record documenting the contract right plaintiff now claims. It is quite simply inconceivable to the court that a right identified as so central to the parties' bargain—one that plaintiff maintains stood as the consideration for the relinquishment of a $2 million claim—would have given rise to no letters, no internal memoranda, no contemporaneous written evidence of any kind confirming that such a right was within the contemplation of the parties at the time the 1989

---

[5](...continued)

> [Y]our question as to why concession contracts did not contain a provision acknowledging the concessioner's right of preference . . . was asked many times . . . . My (NPS) response was that it was not necessary because the United States Code granted the right of preference to every concessioner who operated in a satisfactory manner.

Similarly, in a 2001 affidavit, the Park Service's Chief of Concessions from 1981 to 1989 claimed that he told concessioners that they "did not need to have the right of preference written into their contracts because they already had that contractual right under [the 1965 Act]." Finally, in a June 10, 1994, letter to another concessioner, the Park Service likewise advised:

> The issue of the preferential right of renewal is clear at this juncture. Under [the 1965 Act], you now enjoy the "preferential right to renewal." Although this right is not stated in the concession contract, it is implied by the act and, therefore, granted.
>
> With conditions right for the passage of the [1998 Act] now before Congress, provisions allowing for "preferential right" in renewal may change. Whether you will retain your rights under the old public law or conform to the provisions of the new law has yet to be determined.

We thus see no reason to interpret the documents and affidavits cited by plaintiff as standing for any proposition other than that the preferential right of renewal was conferred by statute—rather than by contract—and therefore does not survive the 1998 repeal.

contract was signed. Plaintiff acknowledges that its outside counsel, George B. Hartzog, Jr. "was aware of the possibility . . . that Congress might amend the existing law to deprive concessioners of their statutory entitlement to rights of preference in renewal," and that its then-president, Joseph A. Moran, conceded that "as early as 1976, Circle Line had received materials recommending that Congress 'consider eliminating section 5 of [the 1965 Act] to eliminate the preferential right of concessions of the National Park Service to renew their concession contracts or permits.'" In light of these facts, it is all the more striking that plaintiff did not insist that its preference for renewal be put into writing and that the evidence plaintiff now offers in support of its position are affidavits written more than 20 years after the fact. Such a showing is insufficient to demonstrate any likelihood of success on the merits.

B. Valuation and Transfer of Plaintiff's Assets

In preparing the prospectus for the follow-on contract, the Park Service relied on the work of Admiralty Marine Surveyors, Inc., a team of certified marine surveyors hired as a subcontractor to inspect plaintiff's seven vessels and provide a "fair value" for each.[6] The resulting valuation report contained a detailed discussion of the methodology used, including the averaging of replacement cost estimates from three different shipyards (found to be in the neighborhood of $33.5 to $36.1 million for the seven vessels) and the use of straight-line depreciation to account for the above-average condition of the boats. Based on that approach, Admiralty Marine calculated a fair value in the range of $11.9 to $12.6 million.

Defendant explains that the Park Service then selected the high end of the range identified by Admiralty Marine ($12.9 million) and increased it by 50 percent in order to (1) provide a basis for comparison with comparable boats for sale on the market; (2) account for the likelihood that plaintiff, as the incumbent contractor and the seller of the boats, would appraise the boats at a higher amount; (3) address the possibility that the follow-on concessioner would replace the older boats in the fleet with newer models; and (4) allow the Park Service to set a lower minimum franchise fee to generate more competition. In the final prospectus, the Park Service identified the fair value of plaintiff's fleet as $18.8 million.

Plaintiff, for its part, calculated a replacement value of its vessels as between $41.8 and $46.5 million based on an estimate provided by Blount Boats, Inc., the

---

[6] Under the terms of its current contract, plaintiff is entitled to the "fair value" of its assets, defined as the "replacement cost less depreciation and obsolescence," should plaintiff be required to sell its assets to a follow-on concessioner.

original builder of plaintiff's fleet.[7] In plaintiff's view, the solicitation is defective because it fails to disclose information concerning the basis for its valuation which would have a "significant effect" on competition. The Park Service, however, in addition to relying on the detailed report of a valuation expert in reaching its fair value estimates, cautioned prospective offerors in the prospectus that its estimates are not binding[8] and further alerted them to the discrepancy between plaintiff's and the Park Service's positions through its written responses—including the disclosure of plaintiff's submission asserting a $44 million valuation for its boats. In light of these facts, we are unable to conclude that the Park Service's valuation of plaintiff's assets was arbitrary or that its identification of fair value in the prospectus was in any way defective.

Nor do we find fault with the asset transfer process itself. The prospectus identifies the applicable transfer procedures as those outlined in the contract, which provide that the matter will move to binding arbitration should plaintiff and its successor not agree on a price. Plaintiff contends, however, that the Park Service's proposed schedule, contemplating the commencement of operations under the new contract by September 17, 2007, may require that the assets be transferred before the arbitration process has been completed and fair value has been paid. Plaintiff thus challenges the solicitation on the ground that it fails to disclose to potential offerors that a follow-on concessioner will be required to pay for plaintiff's assets in full in advance of any transfer of assets under the contract.

The harm plaintiff anticipates—that the Park Service will reinterpret the existing contract in a manner contrary to its plain meaning and will require the transfer of plaintiff's assets in advance of payment—is an injury that has not yet occurred and is one that plaintiff has not demonstrated is likely to occur. Putting aside the fact that the contract provides no mechanism for transfer without

---

[7] Plaintiff's valuation represents the <u>replacement</u> cost of its vessels—several of which are more than 30 years old—which is necessarily higher than the <u>fair value</u> of those assets.

[8] The prospectus provides:

> Offerors should not rely on [Park Service] estimates in preparing and submitting proposals in response to this Prospectus. It is the responsibility of Offerors to make their own estimates of the compensation that must be paid to the Existing Concessioner under the terms of the Existing Contract.

Toward that end, the Park Service provided offerors a list of the boats in question and a comprehensive list of maintenance and repair items.

compensation and that the Park Service would have no authority to effectuate such a transfer, Northern Border Pipeline Co. v. 86.72 Acres of Land, 144 F.3d 469 (7th Cir. 1998) (holding that there must be a specific source of statutory authority to allow private parties to take immediate title to property they seek to condemn), this court is simply not willing to take action against such speculative harm. The court therefore finds it sufficient that the Park Service specified in the solicitation that the transfer of assets will occur pursuant to plaintiff's existing contract; the injuries plaintiff imagines are strictly conjectural.

C. Setting Fare Rates

In its final objection to the proposed solicitation, plaintiff argues that the prospectus freezes passenger fares at below-market rates until 2011, thereby failing to account for inflation and preventing the awardee from exercising its statutory prerogative to set reasonable and appropriate rates to generate revenue. See 16 U.S.C. § 5955(a). Plaintiff contends that while the 1998 Act allows the Park Service to propose contract terms regarding rates for services and permits the Park Service and the concessioner mutually to agree on such terms, the Park Service has no authority to require that a bidder accept the Park Service's own, unilaterally set terms or risk being found nonresponsive. Plaintiff additionally points to the Park Services's own policy manual in support of its assertion that the concessioner should propose, and the Park Service approve, any rate adjustments.

Although 16 U.S.C. § 5955(a) provides that "[e]ach concessions contract shall permit the concessioner to set reasonable and appropriate rates and charges for facilities, goods, and services provided to the public" (emphasis added), those rates are subject to the approval of the Secretary of the Interior, which necessarily means that the Park Service can identify in a solicitation the rates it will approve. 16 U.S.C. § 5952(10) (Award of concessions contracts) additionally specifies that "[n]othing in this subchapter shall be construed as limiting the authority of the Secretary to determine whether to issue a concessions contract or to establish its terms and conditions in furtherance of the policies expressed in this subchapter." The Park Service is thus well within its rights to specify in the prospectus those rates it believes will increase public access to National Parks.

II.

Irreparable Harm

Even were we to accept plaintiff's allegations that both parties intended the right of preference in contract renewal to rise to the level of a contract term, the most that can be said is that the Park Service's refusal to honor that term constitutes a

breach of plaintiff's contract. United States v. Winstar Corp., 518 U.S. 839, 885 (1996) (observing that "damages are always the default remedy for breach of contract"). Because there is an adequate remedy of law for such a breach—the pursuit of contract damages—plaintiff is not entitled to specific performance.

Plaintiff relies on a number of cases to support its assertion of irreparable harm despite the existence of an enforceable contract. See, e.g., Magic Brite Janitorial v. United States, 69 Fed. Cl. 319, 321 (2006) (defining as an irreparable injury a "delay in earning [a] stream of profits under [a] contract" since it "may not be remedied through a damages award"); Transatlantic Lines LLC v. United States, 68 Fed. Cl. 48, 57 (2005) (identifying "[t]he potential loss of a valuable business on [a] contract" as "sufficient to prove irreparable harm" particularly when those harms would be difficult to quantify in retrospect); Metcalf Constr. Co. v. United States, 53 Fed. Cl. 617, 645 (2002) (deeming an irreparable injury the "lost opportunity to fairly compete for and perform work under the contract, including but not limited to lost profits that would generate therefrom").

Taken together, we read these cases as standing for the proposition that a harm is irreparable—and thus injunctive relief is potentially available—where the possibility for proving monetary damages, including lost profits, is unduly speculative, rendering such a claim inadequate as a remedy of law. See, e.g., Hawaiian Dredging Constr. Co. v. United States, 59 Fed. Cl. 305, 317 (2004) (noting the "usual rule" that a "mere loss of money does not qualify as irreparable harm if the party can be made whole through money damages when the claim is resolved on the merits"). But where, as here, a plaintiff seeks to enforce a contract right and has an established history of operation, any remedy would be in contract and any damages would be readily proveable.

Nor are we persuaded by the testimony of J.B. Meyer, plaintiff's current president, who asserts in his affidavit that unless plaintiff's right to a preference in contract renewal is enforced by injunction, it will face a Hobson's choice: in order to establish its status as a qualifying bidder, plaintiff may either accept the terms and conditions of the solicitation as stated in the prospectus and thereby waive its asserted contract right or, alternatively, protest the terms and conditions of the solicitation and thereby render its bid nonresponsive. The choice thus presented is said to constitute a potential harm only redressable by injunctive relief.

We do not agree with this assertion. It is not the issuance of a solicitation denying plaintiff's preference in renewal that constitutes an invasion of plaintiff's alleged contractual right. Rather, the Park Service's failure to recognize that right in the later bid evaluation process would be the source of any potential harm. Plaintiff's submission of a responsive bid waives nothing.

CONCLUSION

For the reasons articulated at oral argument and set forth above, plaintiff's motion for a preliminary injunction and temporary restraining order is denied and the Clerk is directed to dismiss plaintiff's complaint.

s/John P. Wiese
John P. Wiese
Judge